THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | 3:17-CR-258 |
| v. | : | (JUDGE MARIANI) |
| | : | |
| LARRY GILLIAM, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION
## I. INTRODUCTION

Defendant Larry Gilliam's Motion to Suppress Physical Evidence ("Motion") (Doc. 36) is pending before the Court.  In the August 29, 2017, five-count Indictment, Defendant is charged with two counts of distributing heroin and carfentanil, in violation of Title 21, United States Code Section 841(a)(1), one count of possessing with intent to distribute carfentanil and heroin in violation of Title 21, United States Code Section 841(a)(1), one count of possessing a firearm in furtherance of a drug trafficking in violation of Title 18 United States Code, Section 924(c) and one count of being a prohibited person in possession of a firearm, in violation of Title 18, United States Code, Section 922(g).  (Doc. 1.)

The charges stem from a controlled purchase by a confidential informant ("CI") from Defendant in Wilkes-Barre, Pennsylvania on July 21, 2017, where the CI arranged for a purchase of 10 grams of a pink substance in exchange for $1,000.  (Doc. 40 at 5.)  As soon as the controlled buy was concluded, "officers moved in and affected an arrest." (Doc. 37 at 10 (Citing Ex. A at 7, July 22, 2017, Affidavit of Probable Cause (Doc. 37-1 at 7).)  Officers

subsequently conducted a search of a house at 374 Main Street, Wilkes-Barre,

Pennsylvania, to which they gained entry using keys confiscated from Defendant at the time

of his arrest.  (Doc. 37 at 13 (citing Doc. 37-1 at 8).)  Once inside the building, they used

another confiscated key to gain entry into a locked room on an upper floor of the house.

(*Id.*)  Based on the July 21, 2017, search of 374 North Main Street, a search warrant was

applied for and issued on July 22, 2017.  (Doc. 37-1.)  The search was conducted on July

22, 2017, by the Pennsylvania State Police Clandestine Lab Team and yielded, *inter alia*,

controlled substances, firearms, and cell phones.  (Doc. 37-1 at 11-13; Doc. 37-2 at 2-3.)

    With the pending Motion, Defendant seeks to suppress all physical evidence seized

from 374 North Main Street in Wilkes-Barre, Pennsylvania: officers' initial entry into the

building and subsequent entry into a locked interior room took place without a warrant under

circumstances which did not give rise to a valid exception to the warrant requirement.  (*Id.*

¶¶ 11-12.)   Defendant further maintains that, because the officers were not lawfully in the

building, they could not use information about contraband observed therein in an affidavit of

probable cause for a search warrant and without the information, the warrant lacked

probable cause.  (*Id.* ¶¶ 13-14.)  Defendant requested a suppression hearing, including a

*Franks* hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) (*id.* at 4), the latter "because

the affidavit of probable cause for the search warrant contained materially false statements

made knowingly, intentionally, and with reckless disregard for the truth" (*id.* ¶ 15).

Following extensive briefing (*see* Docs. 37, 40, 41, 45, 53, 54), the Court scheduled

an evidentiary hearing for June 25, 2019.  (Doc. 55.)  The Court noted that, although the

Government had acknowledged that a limited *Franks* hearing was appropriate, it would hold

Defendant's request for a *Frank's* hearing in abeyance.[1]  (Doc. 55 at 1 & n.1.)  Both the

Government and Defendant filed motions to continue the suppression hearing (Docs. 70,

72), and the hearing ultimately took place on August 13, 2019.  (Doc. 90.)  Based on

conversations with counsel and their representation at the suppression hearing regarding

whether a separate *Franks* hearing was not needed, the August 13th hearing proceeded on

suppression and *Franks* issues.[2]  (Doc. 90 at 3 (August 26, 2019, Suppression Hearing

Transcript (hereinafter "Hr'g Tr.") 3:4-20).)

At the close of the hearing, the Court set a briefing schedule, allowing the parties to

file supplemental briefs and reply briefs.  (Doc. 90 at 214 (Hr'g Tr. 214:16-21).)  On October

7, 2019, the Government filed its Supplemental Brief in Opposition of Suppression (Doc. 96)

and Defendant filed Defendant's Post-Hearing Brief in Support of Motion to Suppress

---

[1]  The Court concluded that a suppression hearing could aid in limiting the issues to be addressed at a *Franks* hearing and, if Defendant's motion were granted on one or more bases raised by Defendant, the request for a *Franks* hearing would be rendered moot.  (Doc. 55 at 1 & n.1.)

[2]  The day before the scheduled August 13, 2013, hearing, the Court conducted a status conference to address whether the suppression hearing could be consolidated with a *Franks* hearing. Because the Government was not prepared to proceed with a *Franks* hearing, the Court determined that a *Franks* hearing would be held at a later time if necessary.   However, the next morning, the Government agreed that a separate *Franks* hearing was not needed and all issues could be addressed at the convened suppression hearing.  (Doc. 90 at 3 ("Hr'g Tr.) 3:4-20).)  Therefore, the hearing proceeded on that dual basis. (*Id.*)

Physical Evidence (Doc. 97).  Defendant filed his reply brief on November 4, 2019.  (Doc.

102.)

## II.  BACKGROUND

On June 19, 2017, Detective Edward Palka of the Kingston, Pennsylvania, Police

Department, and other officers saw suspicious activity in an area known for drug activity.

(Doc. 37 at 7; Doc. 40 at 2.)   After very brief surveillance, they observed a black male exit a

dark colored BMW with dark tinted windows and New Jersey license plates.  (*Id.*)

Eventually, Palka determined that the man, Keenon Brown, had an active warrant for his

arrest and took him into custody.  (*Id.*)  During a search conducted incident to the arrest,

Palka discovered a bag of suspected heroin in the man's back pocket and a bag of a pink

powdered substance.  (*Id.*)   After learning that Brown was staying at the nearby Budget Inn

with a female companion, Palka and Special Agent Ryan Kovach knocked on the door of

Room 131 and were allowed entry by the female inside.  (Doc. 37 at 8; Doc. 40 at 3.)  Upon

entering the room, the officers observed drug paraphernalia, and drugs.  (*Id.*)  They

subsequently transported the female to the Kingston Police Department.  (*Id.*)

Officer Palka testified that he sought rapid testing of the confiscated pink substance

because he had received information about the dangers of carfentanil and wanted to know

what he was dealing with.  (Doc. 90 at 61-63 (Hr'g Tr. 61:5-63:19).)  Although he did not

receive the official lab report unitl after July 21, 2017, he testified that he learned the pink

substance contained carfentanil, fentanyl, and heroin in a conversation with the lab on July 20, 2017.  (Doc. 90 at 63 (Hr'g Tr. 63:19-21).)

At the police department, both Brown and the female admitted to purchasing drugs from "LB" and Brown stated that "LB" had his four-year-old son with him in the car during the buy earlier that day.  (Doc. 37 at 8.)  The female said she spends between $700 and $1000 a day on narcotics, and both individuals discussed the vehicles "LB" drives (the BMW, a big black truck, a motorcycle, or a Toyota rental vehicle) and the locations where they meet him (Kingston or the area of Pete's Deli on North Main Street in Wilkes-Barre).  (Doc. 37 at 8; Doc. 40 at 3-4.)  They also reported that "LB" was going to New York and would return on Friday, July 21, 2017.  (Doc. 37 at 8.)  The female told officers that "LB" had told her he would sell her the pink substance when he returned on Friday.  (Doc. 37 at 9; Doc. 40 at 4.)

The female agreed to participate in a controlled buy (10 grams of a pink substance in exchange for $1000 (Doc. 40 at 5)), on July 21, 2017.  (Doc. 37 at 10; Doc. 40 at 5.)  Palka testified that he and other officers then did "a lot of research" in setting up the buy.  (Doc. 90 at 68 (Hr'g Tr. 68:1).)   Through Officer Jeffrey Ference of the Wilkes-Barre Police Department and Luzerne County Drug Task Force, Palka learned that the black truck was linked to Defendant who had reported it vandalized in the area of Butler and North Main Streets in Wilkes Barre.  (Doc. 90 at 68 (Hr'g Tr. 68:19-69:18).)   The CI was shown a photo of Defendant, and she identified him as the man she knew as "LB."  (Doc. 37 at 9-10; Doc. 40 at 4-5; Doc. 90 at 69 (Hr'g Tr. 69:20-23).)

Palka testified that numerous agencies were involved in the operation as well as helicopters, vehicles and people on foot.  (Doc. 90 at 70 (Hr'g 70:1-2).)  He also testified that he recorded the call between the CI and Defendant during which Defendant "said that he had his kids with him."  (*Id.* at 70 (Hr'g 70:6-7).)   The transcript of the recording indicates that the phone call between the CI and Defendant took place at 8:12 p.m. on July 21, 2017.  (Doc. 98-1.)  In attempting to establish the time and place for the buy, the CI said she could not meet Defendant at Montage and her ride was not available "right now"; Defendant said he was trying to work something out that he could still link up "'cause I got my kids."  (Doc. 98-1 at 1.)  At first Defendant said it didn't "have to be right now," but then he asked the CI "Are you ready right now?".  (*Id.*)  She responded affirmatively, and they originally set Pittston as the meeting place with Defendant wanting to meet

> as soon as possible . . . 'cause I gotta—I gotta go—I gotta—I'm about to check the kids to eat, and it's like—You know, so I gotta—I'm about to meet them. I'm about to meet them somewhere, so I gotta pass through there anyway.   So you know where, uhm, uh, fuck . . . Walmart? Walmart over there?"

 (Doc. 98-1 at 2.)  When the CI responded that she could be at Walmart in twenty to thirty minutes, Defendant responded "it's not gonna work" and asked if he could come to her. (*Id.*)  The CI identified Wilkes-Barre as her location and she arranged to meet Defendant at the McDonald's near the River Grill in Wilkes-Barre in ten minutes.  (*Id.* at 2-3.)

 Palka testified that, after the phone call, things became quite hectic because they had to set up the surveillance in the area of the buy and come up with a plan for the CI. (Doc. 90 at 72 (Hr'g Tr. 72:5-8).)  The buy preparation included that they

had a signal, she was provided with an audio/video recorder, she was provided with a thousand dollars in cash, and she was advised of a trouble signal, if she got into the car and something happened, or if she got out of the car and everything was good and she did have the items, a visual signal to give off, versus if she got out of the car and did not have the drugs, another visual signal to give off and we proceeded to make our way over there.

(Doc. 90 at 72 (Hr'g Tr. 72:11-17).)

The Affidavit of Probable Cause indicates that, after exiting the vehicle, the CI gave officers a visual signal that she had the agreed upon substance. (Doc. 37-1.) Defendant was arrested immediately thereafter. (Doc. 37 at 10; Doc. 40 at 5.) Palka testified that he met with the CI who turned over the drugs and recording equipment to him; Defendant was advised of his Miranda rights by Detective Kotchik and was then transported to the Kingston Police Department; and Officer Ference took possession of the vehicle and drove it over to the Kingston Police Department. (Doc. 90 at 73-74 (Hr'g Tr. 73:23-74:4).)

When asked what happened when Defendant got back to the police station, Palka testified that Defendant

was searched further and put in a cell, and then we came out, searched the vehicle there, and began to formulate a plan as to where these kids were. We didn't know if the kids were going to be in the vehicle with him, at the time. In the tape, you'll hear him reference, I have my kids, so people were made aware of that situation going in, it's a dangerous situation considering you can't see inside of the vehicle. However, now we had no kids, we didn't know where the kids were. So we were assuming that they were back at the house on North Main Street. We had a very strong indication that he was living on North Main Street, but we weren't exactly sure where he was living.

So myself and Detective Kotchik and, I believe, another officer, maybe, Miller, were speaking about what to do, but then Miller left and went with Officer

Ference, they immediately left and went to try to find this house on North Main Street.

(Doc. 90 at 74-75 (Hr'g Tr. 74:15-75:6).)

Palka then went to talk with Defendant in his cell and Defendant agreed to talk with him. Much of the substance of that conversation is at issue.

Palka stated in his Affidavit that he told Defendant he knew he was staying in a house on North Main Street in Wilkes-Barre and, when he asked Defendant if anyone was inside and posed a danger to officers, Defendant responded that "there were only kids in the house"; when asked how old the oldest person in the house was, Defendant said "twelve." (Doc. 37-1 at 7.) At the hearing, Palka testified that Defendant told him that his sons, ages five and twelve, were the only ones in the house on North Main Street. (Doc. 90 at 76 (Hr'g Tr. 76:9-16).)

At the hearing, Palka confirmed that he did not know that Defendant lived on North Main Street when he was questioning him at the police station. (Doc. 90 at 119 (Hr'g Tr. 5-8).) Palka also confirmed that his assertion to Defendant that officers had followed him to that residence after a buy were false statements. (*Id.* (Hr'g Tr. 110:19-22).) Palka's averments regarding the North Main Street address made in the Affidavit of Probable Cause for the Search Warrant Application were also the subject of questioning at the hearing. (Doc. 90 at 112-119 (Hr'g Tr. 112:1-119:24).) In the Affidavit, Palka stated that, when Defendant asked him what house he was talking about, he responded "[t]he house on North Main Street" and Defendant responded "[b]ut I don't actually live there, I just stay there

8

sometimes." (Doc. 37-1 at 7.)  The Affidavit continues: "Det. Palka then advised that it didn't matter, that he was observed leaving there and followed to the buy and then followed directly back there after Police purchased drugs from him." (*Id.*)  At the hearing, Palka conceded that this was a false statement: "No, there was actually no buy.  This was—it was a buy by Keenon Brown, but it wasn't supervised by police.  So, yes, it was a false statement, we did not follow him, but I believed wholeheartedly that he sold those drugs to Mr. Brown."  (Doc. 90 at 119 (Hr'g Tr. 119:6-9).)

Palka also testified that "as time went on" he was thinking what else they could look for and went back to talk to Defendant who said he wanted to make a phone call to Connie Overstreet "in reference to his kids, to check on his kids." (*Id.* at 78 (Hr'g  Tr. at 78:1-7).) Palka said that he got the phone number but was "feeling as though the reason he wanted to make a phone call was to destroy evidence, . . . make sure that people knew he was in jail, because maybe people didn't know yet." (*Id.* (Hr'g Tr. at 78:8-13).)  After discussing the matter with others, Palka called Ference who then called Overstreet.  (*Id.* (Hr'g Tr. 78:16-19).)  Palka estimated the time from arrest to the conversation with Defendant about Oversteet to be about an hour and a half.  (*Id.* at 79 (Hr'g Tr. 79:1-5).)  In the Affidavit of Probable Cause, Palka places his receipt of the information about Overstreet at the end of his initial conversation with Defendant: after reciting details about the North Main Street residence,

> Palka then stated, "I want to know, how much of that pink powder substance is in the house."  Mr. Gilliam stated, "I don't want to incriminate myself" and

refused to answer any further questions, but wanted to make a phone call to a female named Connie Ovalstreet, to check on his kids."

(Doc. 37-1 at 7.[3])

Defendant testified that the first thing Palka said to him upon entering the holding cell when he reached the cell was about his need to cooperate if he cared about his kids although Palka said he himself did not care about them.  (Doc. 90 at 171-72 (Hr'g Tr. 171:25-172:8).)  Defendant confirmed that Palka asked him what he would encounter if they searched his house.  (*Id.* at 172 (Hr'g Tr. 172:16-19).)  However, Defendant did not take the question to be in reference to Wilkes-Barre but rather he thought Palka was referring to his New Jersey house because he told Kotchik that he lived in New Jersey during his transport to the police station.  (*Id.* (Hr'g Tr.172:20-25).)  Defendant says he answered numerous questions about the house, including who lived there, and he answered them all in reference to New Jersey, stating that he lived alone.  (*Id.* at 173 (Hr'g Tr. 173:1-22).)  Defendant also testified that, during this conversation, he told Palka he wanted to make a call to Connie Overstreet who had his children at Red Lobster in Scranton and he was supposed to meet them there.  (*Id.* at 174 (Hr'g Tr. 174:2-15).)  Defendant testified that Palka then asked him the ages of the children, to which Defendant responded five and twelve.  (*Id.* at 174 (Hr'g Tr. 16-22).)   Defendant said Palka promised a call.  (*Id.* (Hr'g Tr. 174:23-25).)

---

[3] Palka testified that he originally thought Defendant had said "Ovalstreet" and later learned it was "Overstreet."  (Doc. 90 at 78 (Hr'g Tr. 78:5-7).)

Defendant further testified that he was booked after this initial conversation and later asked again for the phone call but at this time Palka said no because "the investigation is still ongoing, they had to go search the house." (Doc. 90 at 175 (Hr'g Tr. 90 175:1-14).) Defendant said he thought Palka meant the New Jersey house, but Palka clarified that he meant the house in Wilkes-Barre at which point Defendant said he did not live in Wilkes-Barre. (*Id.* (Hr'g Tr. 175:16-25).)

Defendant also said that, at some point, Palka offered to make the call to Overstreet and Defendant gave him the number but the call was not made in Defendant's presence. (*Id.* at 176 (Hr'g Tr. 176:1-22).) Upon cross-examination, Defendant confirmed that he first told Palka that his children were with Overstreet and he wanted to make a phone call during his initial questioning in the holding cell. (*Id.* at 183-85 (Hr'g Tr. 183:25-185:15).)

Ference testified that, after taking Defendant's car to the Kingston Police Department, he had gone to Wilkes-Barre with another officer "to assist in locating Mr. Gilliam's children" and they went to Wilkes-Barre because "it was alleged that his children may be at a residence there alone" and the officers believed the residence to be somewhere on North Main Street. (*Id.* at 131-32 (Hr'g Tr. 131:12-132:3).) Ference said he conducted "knock and talks" in the area of North Main and Elm for about an hour to see if anyone knew if Defendant lived there or if there were any children alone in the apartment but he was unsuccessful. (*Id.* at 132 (Hr'g Tr. 132:5-13).)

Regarding the call from Palka about Overstreet, Ference stated that Palka wanted him to call Overstreet to see if he could ascertain the location of the children.  (Doc. 90 at132  (Hr'g Tr. 132:14-22).)  Ference said he then called Overstreet and told her that Defendant had been involved in an incident:

> I had explained to her that we were looking for Mr. Gilliam's children to see where they were and if they were with someone, because Mr. Gilliam wouldn't be coming back to them to have care and custody of them.
>
> She had asked me a few more questions as to, [w]ell, what occurred?  I said I didn't want to get into specifics, yet.  I just kept asking, I need to know where the children are, if the children are safe.  She didn't give me any indication of where they were of if she had the children.
>
> Went back and forth.  I had given her the address to the Wilkes-Barre Police Department.  At one point, she had said she would drive down to meet me at the police station, which didn't occur.

(*Id.* at 133 (Hr'g Tr. 6 133:6-18).)

Overstreet remembers the call differently.  She testified that she received a phone call at about 10:22 p.m. from a police officer who said that Defendant had been in a bad accident and he wanted to know where she was so that he could come and talk to her.  (*Id.* at 12 (Hr'g Tr. 12-20).)   After reiterating that he wanted to come meet her and didn't' want her to leave her location, Overstreet testified that she "pretty much insisted that he give me an address to meet him, because I didn't want him to come there in front of Larry's kids, and I needed to try to find someone to watch them." (*Id.* at 13 (Hr'g Tr. 13:11-15).)   Overstreet confirmed that she told Ference where she was, that she had Defendant's children with her, that she planned to find someone to care for the children, and the reason she planned to do

12

so.  (Doc. 90 at 13-14 (Hr'g Tr. 13:21-14:8).)  She said he did not ask about Defendant's WIlkes-Barre address but he gave her an address at which to meet him.  (*Id.* at 14 (Hr'g Tr. 14:9-13).)  Overstreet testified that she first talked with Richard Green, the landlord for 374 North Main Street, about getting someone to watch the children and he put her in touch with Defendant's friend, Basheen Brown, who agreed to watch the children at his house at 374 North Main Street.  (*Id.* at 14-15 (Hr'g Tr.14:20-15:4).)  Overstreet noted that she learned that the address she had been provided was the Wilkes-Barre police department, which she thought was strange, but she proceeded toward Wilkes-Barre to take the children to Brown. (*Id.* at 15:7-19.)  She said she called Brown while on her way to Wilkes-Barre to let him know that the meeting location was a police department.  (*Id.* at 15-16 (Hr'g Tr. 15:20-16:1).)

A short time after Palka called Ference with the Overstreet information, another officer in the cell block recognized Defendant and said he had stopped him earlier in the day in a rented Toyota with Connecticut license plates.  (*Id.* (Hr'g Tr. 79:9-15).)  Palka says he then relayed this information to Ference and Miller, stating they had a new car to look for in the area of Butler and North Main.  (*Id.* (Hr'g Tr. 79:22-23).)  A few minutes later, Ference and Miller found the Toyota.  (*Id.* (Hr'g Tr. 79:24-25).)  When asked whether, between the time that he passed the information about Overstreet to Ference and they found the residence, Palka had a conversation with Ference about Overstreet having the kids, Palka

testified that Ference told him Oversteet was coming to meet him at the police department but

> he never said anything about her having children.  We still had no idea where the children were, that's what we were concerned about, not only that, but anybody else that was in contact with this stuff, but definitely the children, considering what we know that he had the children on previous drug deals, we knew that he stated that he had the children with him when we called him, so, yes, we were thinking that the children were in this area.

(Doc. 90 at 80 (Hr'g Tr. 2-17).)

Ference testified that they located the Toyota in front of 374 North Main Street and that house had multiple lights on when all others were in darkness or vacant.  (*Id.* at 134 (Hr'g Tr. 134:19-25).)  He stated that he was aware from the investigation that carfentanil could be present in the suspect location, he was also aware of its dangerous properties, and this was part of the calculation in trying to find Defendant's children.  (*Id.* at 135 (Hr'g Tr. 135:5-25).)  Ference explained that they went to the front door of 374 North Main Street and knocked.  (*Id.* at 136 (Hr'g Tr. 135:1-3).)  When no one responded, he tried what he believed to be keys to Defendant's residence.  (*Id.* (Hr'g Tr. 136:10-24).)  After using two keys, one for the lower lock and one for the dead bolt lock, they were able to open the door and proceeded to announce themselves.  (*Id.* at 137 (Hr'g 137:1-8).)  He added that the officers "did see a gentleman walk past in the kitchen area of the house, he paid no business to us, he didn't turn or didn't come to us" and, at that point, the officers entered the house.  (*Id.* (Hr'g 137:8-12).)  Ference stated that the purpose of the entry was to locate the children.  (*Id.* (Hr'g Tr. 137:13-14).)

When questioned further about the entry, Ference testified that he did not need more information about whether the officers had the house where the children could be because

> our information was obtained and solidified by the keys of Mr. Gilliam fitting the lock of the front door and opening the front door, so, at that point, we believed through, you know, our own personal experience of keys opening a door, we opened the door, they were Mr. Gilliam's keys, that that was where the children could possibly be.

(Doc. 90 at 152 (Hr'g Tr. 152:5:10).)  When asked why he had kept the keys which he normally would have inventoried at the station when he took the car back, Ference responded "I'm not sure why I did have them." (*Id.* (Hr'g Tr. 152:14-17).)

Ference explained that, upon entry, some officers went to talk to the man in the kitchen and other officers went upstairs, some to the second floor and some to the third floor. (*Id.* (Hr'g Tr. 137:16-21).)  He testified that the officers on the third floor found other people and what appeared to be drugs and drug paraphernalia, specifically a scale with a white rock substance in open plain view and a small personal blender with a pinkish powder substance on it which was consistent with the substance purchased from Gilliam. (*Id.* at 137-38, 145 (Hr'g Tr. 137:20-138:3, 145:11-15).)  Ference said the officers then gathered the individuals on the main floor, asked them about Defendant's children, and ran NCIC checks on them to see whether anyone had any active warrants for arrest. (*Id.* at 138 (Hr'g Tr. 138:6-12).)  He testified that officers continued to search for the children on the second floor where they had encountered a few closed, locked doors, and they attempted to try the keys in those doors. (*Id.* at 137-38 (Hr'g Tr. 137:22-138:24).)  Ference stated that, after

successfully opening the door, they found numerous items in plain view that connected the

room to Defendant, including a receipt for service to a BMW with his name on it.  (Doc. 90 at

139 (Hr'g Tr. 139:1-14).)  He further stated that the officers then exited the room, went back

to the common area where the others were located, and formulated a plan to get the others

out of the residence, secure the residence, and obtain a search warrant for the house to get

any items they located in plain view.  (*Id.* (Hr'g Tr. 139:17-21).)  He confirmed that officers

did not open any drawers or closets when they were looking for the children.[4]  (*Id.* at 145

(Hr'g Tr. 14516-21).)  Ference added that people were removed from the house "[f]or our

safety as well.  As I said, the substance could be dangerous airborne, any type of dropping

it, manipulating it, could be potentially harmful for them."  (*Id.* at 139-40 (Hr'g Tr. 139:22-

140:1.)

Basheen Brown, the man in the kitchen at 374 North Main Street and Defendant's

friend since childhood who knew Defendant's children and Connie Overstreet (*Id.* at 191-92,

193 (Hr'g Tr. 191:20-192:20, 193:21-228)), testified about the officers' entry into 374 North

Main Street and other matters.  He said that around 10:30 on July 21, 2017, while he was in

the kitchen making spaghetti, he got a call from his girlfriend who was on the third floor

---

[4] Asked on cross-examination whether why the incident report left out that officers flipped the bed in the course of going through Defendant's room, Ference responded that he did not recall flipping the bed. (Doc. 90 at 162 (Hr'g Tr. 162:12-21).)  Defendant's counsel pointed to the Government's response to Defendant's motion (Doc. 40) which stated that "officers flipped the bed to see if the kids were underneath it."  (Doc. 40 at 7.)  After Ference testified that "[t]he bed was not, per se, flipped over, it was not flipped" (Doc. 90 at 164 (Hr'g Tr. 164:14), Defendant's counsel sought to admit the brief as impeachment material or party admission. and the Court allowed admission for the limited purpose described (*id.* (Hr'g Tr. 164:15-21

letting him know that Richard Younger, who lived next door, was knocking on the front door. (Doc. 90 at 194-95 (Hr'g Tr. 194:15-195:11).)  He said that when he went upstairs to see what was going on, he talked to his landlord, Richard Green, on Younger's phone and Green said that Defendant had been in an accident.  (*Id.* at 195 (Hr'g Tr. 195:14-21).)

Brown said that he spoke with Overstreet "a couple minutes later"--she told him about the accident and, because she wanted to go see what was going on, she asked Brown to watch the children and he agreed.  (*Id.* at 195-95 (Hr'g Tr. 195:23-196:9).)  Brown said after the call he was going to go back downstairs but Younger stopped him to tell him "there were cops outside in front of the house."  (*Id.* at 196 (Hr'g Tr. 196:11-14).)  When asked his thoughts about that information, Brown testified said "[n]othing, I just went downstairs to go finish the spaghetti."  (*Id.* (Hr'g Tr. 15-17).)

Brown further testified that he saw flashlights going around the side of the house and then heard banging on the front door but ignored it and continued to cook his spaghetti until he heard the front door open at which point he walked toward the front of the house.[5]  (*Id.* at 196-97 (Hr'g Tr. 196:22-197:22).)  Brown said that he encountered officers who told him "to get on the wall" when he exited the kitchen and entered the dining room.  (*Id.* at 197-98 (Hr'g Tr. 197:25-198:11).)  He testified that officers then patted him down and asked "where

---

[5] When asked why he did not do anything when he heard banging on the front door, Brown said "[b]ecause since I had been in the house, any time somebody got company, you usually call up, somebody would call and tell them they had company, that somebody was arriving for them.  So knocking on the door, I usually don't pay it any mind, whether I'm downstairs or not."  (Doc. 90 at 197:11-15.)

are the kids at" to which he responded that there were no children in the house.  (Doc. 90 at

198 (Hr'g Tr. 198:12-20).)   Brown stated that the officers then said "[s]o nobody in this

house has children?" and he said that everyone did but there were no children in the

house."  (*Id.* at 198-99 (Hr'g Tr. 198:24-199:1).)  When asked if officers ever again asked

about children, Brown replied "[n]o, that was the end of children after that."  (*Id.* at 199 (Hr'g

Tr. 199:5-6).)  On cross-examination, Brown confirmed that the officers asked about

children in general, not about Defendant's children.  (*Id.* at 206-07 (Hr'g Tr. 206:20-207:2).)

Following the question about children, Brown stated that officers asked if there were

other people in the house and he said yes.  (*Id.* at 199 (Hr'g Tr. 199:9-14).)  He testified that

officers then went upstairs without asking for permission to do so. (*Id.* (Hr'g Tr. 199:15-18).)

Brown said that when he and the other three tenants were assembled downstairs in the

dining room, officers asked if they knew Defendant and no one said they knew him or

identified a photograph of him they were shown.  (*Id.* at 200-01 (Hr'g Tr. 200:19-201:15).)

They were also asked to identify Defendant's room and no one provided that information.

(*Id.* at 209 (Hr'g Tr. 209:13-17).)   Brown said that, at some point, officers were on the

phone with the landlord who seemed to confirm to officers what room Defendant stayed in.

(*Id.* at 201-02 (Hr'g Tr. 201:22-202:11).)

Overstreet never arrived at the North Main Street location to leave the children with

Brown, testifying that, while on route there, she learned from Younger that police officers

had arrived and they were asking about missing children, clarifying that he did not say they

were asking specifically about Defendant's children.  (Doc. 90 at 43 (Hr'g Tr. 43:1-7).)  She

said she asked Younger whether she should proceed to bring the kids there "to show them

that the kids are not missing" and Younger did not provide a "straight answer" so she made

the decision to take the children back to their grandmother in Rome, New York.  (*Id.* at 16,

43 (Hr'g Tr. 16:2-19, 43:1-11).)  When asked why she did not go to the police barracks to

find out what was going on, she said she "didn't know what was going on, so I made the

best decision that I thought I should make, at that point, which was return the kids to their

grandmother," adding that she "had already been misled by the police (*Id.* at 43 (Hr'g Tr.

43:12-23).)  She also testified that a Kingston police officer contacted her shortly after

midnight on July 22, 2017.  (*Id.* at 26-27 (Hr'g Tr. 26:21-27:2).)  She recalled the

conversation as follows:

> He stated that he was calling to let me know where Larry was at.  I informed
> him that I was aware of that, at that point, and I was upset with him for calling
> me—lying to me, telling me that he had been in a terrible accident.  And he told
> me, at that time, it was not him who called me and told me that, he had no idea
> what I was talking about.

(*Id.* at 27 (Hr'g Tr. 27:7-12).)

Based on the search of 374 North Main Street, an Application for Search Warrant

and Application was submitted to a magistrate judge on July 22, 2017.  (Doc. 37-1 at 1-13.)

Palka and Ference are identified as the Affiants.  (Doc. 37-1 at 1.)  The warrant was issued

and search completed on the same date by the Pennsylvania State Police Clandestine Lab

Team.  (Doc. 37-2 at 2.)  Numerous items were seized in the search, including drugs and

firearms which provided the basis for three counts contained in the August 29, 2017,

Indictment.  (Doc. 1 at 3-5; Doc. 37-1 at 11-13.)  Ference issued the Receipt/Inventory of

Seized Property on July 22, 2017.  (Doc. 37-1 at 11-13.)

### III. ANALYSIS

As noted above, with the pending Motion, Defendant seeks to suppress all physical

evidence seized from 374 North Main Street in Wilkes-Barre, Pennsylvania: officers' initial

entry into the building and subsequent entry into a locked interior room took place without a

warrant under circumstances which did not give rise to a valid exception to the warrant

requirement.  (Doc. 36 ¶¶ 11-12.)   The Government maintains that the entry was justified

pursuant to the exigent circumstances doctrine.  (Doc. 96 at 2.)  The Motion requires the

Court to first consider whether the warrantless entries violated the Fourth Amendment.  If

the Court finds a Fourth Amendment violation, the Court will then consider whether

evidence seized in the search of the premises should be suppressed.

A.  <u>Fourth Amendment Violation</u>

In relevant part, the Fourth Amendment provides that the "right of the people to be

secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated."  U.S. Const. amend. IV.  "The Amendment establishes a

simple baseline, one that for much of our history formed the exclusive basis for its

protections: When 'the Government obtains information by physically intruding' on persons,

houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment'

has 'undoubtedly occurred.'" *Florida v. Jardines,* 569 U.S. 1, 5 (2013) (quoting *United States v. Jones,* 565 U.S. 400, 420 n.3 (2012)).

Warrantless entry into a home is the chief evil that the Fourth Amendment is meant to protect against.  *Jardines,* 569 U.S. at 6 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). "At the Amendment's 'very core' stands the "right of a man to retreat into his home and there be free from unreasonable governmental intrusion." *Id.* (quoting *Silverman v. United States,* 365 U.S. 505, 511 (1961)).  "[T}he area 'immediately surrounding and associated with the home'—the curtilage—is 'part of the home itself for Fourth Amendment purposes.'" *Jardines,* 569 U.S. at 6 (quoting *Oliver v. United States,* 466 U.S. 170, 180 (1984)).  "The front porch is the classic exemplar of an area to which the activity of home life extends." 569 U.S. at 7 (internal quotation omitted).

Whether a search has occurred within the meaning of the Fourth Amendment has been the subject of much consideration by the United States Supreme Court.  Under the "reasonable expectations test," a search occurs whenever the government intrudes upon any place in which a person has "a reasonable expectation of privacy." *Katz v. United States,* 389 U.S. 347, 388 (1979) (Harlan, J., concurring).  Application of the test involves two steps: "whether the individual has, by his conduct, has exhibited an actual expectation of privacy . . . [and] whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Bond v. United States,* 529 U.S. 334, 338 (2000) (internal quotation and citation omitted).

Under the "simple baseline" identified in *Jardines*, known as the "the common-law trespassory test," *United States v. Bain*, 874 F.3d 1, 12 (1st Cir. 2017), physical intrusion into the "curtilage" of a home without license constitutes a search under the Fourth Amendment even when no intrusion into the home occurred: "That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Jardines*, 569 U.S. at 11. However, "[a] police officer not armed with a warrant may approach a home in hopes of speaking to its occupants, because that is 'no more than any private citizen might do.'" *Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). The scope of a license is limited not only to a particular area but also to a specific purpose, and there is no customary invitation to enter the curtilage simply to conduct a search. 569 U.S. at 9-10. An implicit license to enter onto another's property "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Thus, while a police officer may approach a home and knock, when an officer not armed with a warrant knocks on a door and requests the opportunity to speak, the occupant has no obligation to open the door or to speak. *King*, 563 U.S. at 69-70 (citing *Florida v. Royer*, 460 U.S. 491, 497–498 (1983) ("[H]e may decline to listen to the questions at all and may go on his way.")). As summarized in *Bain*, "a physical intrusion into a protected area that results in the acquisition of information only fails to constitute a search if that intrusion is permitted by a license." 874 F.3d at 12.

There are exceptions to the general rule that law enforcement must obtain a warrant before entering a home, though the Supreme Court has noted that

> [p]rior decisions of this Court . . . have emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," *United States v. United States District Court*, supra, 407 U.S. [297, 318 (1972)], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.

*Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984).  As stated by the Court of Appeals for the Third Circuit,

> [w]arrantless searches of the home "are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion." [*United States v. Coles,* 437 F.3d 361, 365 (3d Cir. 2006)] (emphasis in original) (citing *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton* [*v. New York,* 445 U.S.573, 586, 100 S.Ct. 1371 (1980)]. We evaluate whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). The Government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy." *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).
>
> Exigent circumstances exist when officers are in hot pursuit of a fleeing suspect, *Coles,* 437 F.3d at 366, when they "reasonably ... believe that someone is in imminent danger," *Couden v. Duffy,* 446 F.3d 483, 496 (3d Cir.2006) (internal citation and quotation marks omitted), or when they reasonably believe that they must act "to prevent the imminent destruction of evidence," *Brigham City,* 547 U.S. at 403, 126 S.Ct. 1943 (citing *Ker v. California,* 374 U.S. 23, 40, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plurality opinion)). The common thread is imminence—"the existence of a true emergency." *United States v. Simmons,* 661 F.3d 151, 157 (2d Cir.2011). "[O]nce the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises." *United States v. Murphy,* 516 F.3d 1117, 1121 (9th Cir.2008) (citing *Mincey v. Arizona,* 437 U.S. 385, 392–93, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)), *abrogated on other grounds*

by *Fernandez v. California,* [571 U.S. 292], 134 S.Ct. 1126, 188 L.Ed.2d 25 (2014).

*United States v. Mallory*, 765 F.3d 373, 383–84 (3d Cir. 2014).

A defendant who seeks to suppress evidence based on a claimed Fourth Amendment violation bears the initial burden of establishing a basis for his motion. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). However, as *Johnson* explained, "once the defendant has established a basis for his motion, *i.e.,* the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citing *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993)). The government must prove by a preponderance of the evidence that the officers conducted the warrantless search in a manner consistent with the Fourth Amendment. *United States v. Lowe*, 791 F.3d 424, 432 n.4 (3d Cir. 2015).

"It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions, and conclusions to be drawn therefrom, are all matters to be determined by the trial judge." *United States v. Britton*, No. 1:13-CR-0014, 2013 WL 1856532, at *1 (M.D. Pa. May 2, 2013), *aff'd*, 608 F. App'x 111 (3d Cir. 2015) (citing *United States v. Staten,* 181 F. App'x 151, 156 (3d Cir.2006)). The trial judge may accept or reject any or all of a witness's testimony and determines credibility based on a number of factors, "including the witness's ability to accurately recollect the matters at hand, the extent to which the

testimony is corroborated or contradicted by other evidence, and whether the testimony withstands a common sense test of reason and logic." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005).

Here, Defendant asserts that "[t]his case involves at least five separate searches—the use of the key in the front door, the initial entry into the house, the continued search on the other floors, the use of the key in the locked interior door, and entry of the room on the second floor." (Doc. 37 at 27-28.) The Court will not discuss each claimed search at this stage of the analysis. However, the Court has no trouble identifying the use of the key in the door as a search for Fourth Amendment purposes.

The Court agrees that Ferences's use of the key in the front door of 374 North Main Street constituted a warrantless search based on the reasoning set out in *Bain* where the First Circuit Court of Appeals addressed the question of "whether the inside of the front door lock is at least within the home's curtilage." 874 F.3d at 14. The Circuit Court considered the factors set out in *United States v. Dunn*, 480 U.S. 294, 301 (1987), for determining whether the area in question "should be placed under the home's 'umbrella' of Fourth Amendment protection and concluded that all factors weighed in favor of finding that the inside of the lock on the door of a home was entitled to such protection. *Bain*, 874 F.3d at 15 (citing *Dunn*, 480 U.S. at 301). Having concluded that putting a key in a lock to see if it fit constituted a physical intrusion into the curtilage to obtain information, *Bain* stated that the action would be a search under *Jardines* unless it is within the "implicit license" which,

as discussed above, "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. Paraphrasing *Jardines*' assessment of the use of a trained police dog to explore the area around a home, *Bain* stated that "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to find that same visitor trying a series of keys on the door's lock "would inspire most of us to—well, call the police." *Bain*, 874 F.3d at 15 (citing *Jardines*, 569 U.S. at 9). As in *Jardines*, *Bain* concluded that "the background social norms that invite a visitor to the front door do not invite him there to conduct a search. *Id.* In short, a search occurred." 874 F.3d at 15.

The court concludes that Defendant's initial burden is satisfied because it cannot be disputed that the officers conducted the challenged searches without a warrant. *See Johnson*, 63 F.3d at 245. Thus, the Government bears the burden of proof in this matter. *Id.* The Government must show, by a preponderance of the evidence, that officers reasonably believed that Defendant's children were in imminent danger and that they had to act to avert the danger. *See United States v. Coleman*, 68 F. App'x 300, 303 (3d Cir. 2003) (not precedential) (citing *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996)).

At the hearing, five witnesses testified as to the events preceding the warrantless entry into 374 North Main Street and subsequent events. Kingston Police Department Detective Edward Palka and Wilkes-Barre Police Officer Jeffrey Ference testified for the Government. Defendant, Connie Overstreet, and Basheen Brown testified for the defense.

The review of hearing testimony set out above indicates that Government witnesses and defense witnesses presented conflicting testimony on numerous issues.  Thus, credibility, internal consistency, and consistency with other testimony must be examined, and whether the testimony withstands "a common sense test of reason and logic" must also be considered.  *See Murphy*, 402 F. Supp. 2d at 569.

The Government posits that in this case

[t]he question of exigent circumstances rests on two propositions: (1) that the potential presence of carfentanil at Gilliam's residence constituted a dangerous condition; and, (2) that police had reason to believe that entry into Gilliam's residence was necessary to protect Gilliam's children or other individuals who could be harmed as a result to exposure to carfentanil.

(Doc. 96 at 19.)   The Government first points to evidence of the dangerousness of carfentanil (*id.* at 19-20) and states "[h]aving established that the potential presence of carfentanil in Gilliam's residence constitutes a dangerous situation, the Court must turn to the reasonableness of the belief by police that the danger to others needed to be mitigated" (*id.* at 20).  The Government then points to the belief by police officers that Defendant's children were home alone, a belief which they say was founded on a number of factors: Keenan Brown's report that Defendant's four-year-old child was present in the back of the vehicle when he purchased drugs from Defendant on July 19, 2017; the CI's report that Defendant claimed to be in New York with his child on the day of the planned controlled buy; during the conversation between Defendant and the CI, Defendant advised the CI that he had his kids and later in the same conversation that he had to take his kids to dinner;

and during questioning at the Kingston Police Department, Defendant indicated that he had two children who were home alone. (*Id.* at 20-21.)

As an initial matter, the Court notes that the mere presence of a dangerous situation does not give rise to exigent circumstances—exigent circumstances are grounded in the reasonable belief "that someone is in imminent danger," *Couden*, 446 F.3d at 496, with the common thread of exemplar situations being "the existence of a true emergency," *Simmons*, 661 F.3d at 157. Second, the Government presents no specific argument, beyond the existence and dangerousness of the drug, regarding the need to protect individuals other than Defendant's children. Because the Government has provided no authority to support the proposition that adult individuals living in a house where a dangerous drug may be present gives rise to a "true emergency" in Fourth Amendment terms, *Simmons*, 661 F.3d at 157, the Court will focus on the arguments regarding Defendant's children.

As to the reasons proffered in support of the belief that the children were home alone, the two of direct relevance are information regarding Defendant's children revealed during the recorded conversation between the CI and Defendant just a short time before the controlled buy and Palka's assertion that, when questioned at the police station, Defendant indicated that he had two children who were home alone. (Doc. 96 at 21.)

In general, Palka's testimony about his beliefs concerning the children's whereabouts are suspect. Palka testified that, when officers executed the buy/bust, Palka "didn't know if the kids were going to be in the vehicle with him [Gillliam], at the time. In the

tape, you'll hear him reference, I have my kids, so people were made aware of that situation going in, it's a dangerous situation considering you can't see inside of the vehicle." (Doc. 90 at 74 (Hr'g Tr. 74:17-21).)  Although Palka recognized the dangerousness of the situation and the potential substance involved and thought the children might be with Defendant, before the buy took place he did nothing to establish whether children were in the car, a determination which he knew could not be made by visual observation before the buy because of the dark tint on the windows.  (*Id.*)  Palka advised the CI about trouble signals and specific visual signals to be used when she exited Defendant's vehicle (*Id.* at 72 (Hr'g Tr. 72:11-17)), but no testimony or evidence suggests that he established any signal or expressed concern regarding the presence of children in the vehicle or where they might be if not in the vehicle.  Further, after the buy was complete, no evidence or testimony indicates that any question was asked of the CI or Defendant about the whereabouts of Defendant's children.  According to Palka, it was only after Defendant was searched and put in a cell at the police station that officers acted on their expressed concern about the children, and that action did not include directly asking Defendant about the children before officers reportedly were dispatched to find them in an area where they believed Defendant to live.  (*Id.* at 74-75 (Hr'g Tr. 74:15-75:6).)

According to Palka's testimony, after the officers went to look for the children in the area of North Main Street, he first went to talk with Defendant, and this is when Defendant allegedly said his two children were home alone in a house on North Main Street.  (Doc. 90

at 75-76 (Hr'g Tr. 75:24-76:18).)  Ference testified that he went to Wilkes-Barre because "it was alleged that his children may be at a residence there alone" and the officers believed the residence to be somewhere on North Main Street.  (Doc. 90 at 131-32 (Hr'g Tr. 131:12-132:3).)  However, at the time Ference went to Wilkes-Barre, Palka's testimony indicates he had not yet talked to Defendant about the children's whereabouts, *see supra*, and, before that conversation, no other information suggested that the children were alone.  On the contrary, the conversation between the CI and Defendant strongly suggested that Defendant was in Wilkes-Barre and, from there, he had to pass through Pittston to meet his children to get something to eat.  (*See* Doc. 98-1 at 1-2.)  Thus, rather than Wilkes-Barre being the suspected location of the children's whereabouts, the recorded conversation, read carefully and reasonably, indicates that the children were not in Wilkes-Barre at the time.  In turn, presuming the availability of the recorded conversation between the CI and Defendant to those involved in the investigation, the reasonableness of the officers' assertion that the exclusive focus on the North Main Street location was to find the children is questionable.

Palka's statement that Defendant told him the children were home alone is in direct contradiction to Defendant's testimony that he told Palka, early in his conversation in the holding cell, that he wanted to reach Connie Overstreet because she had his children at the Red Lobster in Scranton and he was supposed to meet them there.  (Doc. 90 at 174 (Hr'g Tr. 174:6-15).)  Palka testified that he received the information about Overstreet in a conversation with Defendant that took place about an hour and a half after Defendant's

arrest when he returned to talk with Defendant who was "yelling out through the jail cell that he wanted to make a phone call." (Doc. 90 at 78-79 (Hr'g Tr. 78:1-79:5).) However, in the Affidavit of Probable Cause, Defendant's desire "to make a phone call to a female named Connie Ovalstreet, to check on his kids" was expressed to Palka at the end of his first conversation in the holding cell. (Doc. 37-1 at 7.) If the timeline in the Affidavit and that stated by Defendant are credited, Palka had the information about Overstreet for more than an hour and a half before he provided the information to Ference who called Overstreet at 10:22 p.m. (Doc. 90 at 12 (Hr'g Tr. 12:12-16).) If Palka's hearing testimony is credited, he waited an hour and a half to attempt to elicit more information about the children he believed to be home alone and in grave danger—no evidence or testimony indicates he had done anything more than dispatch two officers to Wilkes-Barre to learn about the children's location and welfare, militating against a finding of a "true emergency," *Simmons*, 661 F.3d at 156. Further, no matter when Palka knew that Defendant wanted to talk to Overstreet about his children, Palka said that he hesitated about calling Overstreet because he was concerned about Defendant wanting to destroy evidence and he had to further discuss the matter with others. (Doc. 90 at 78 (Hr'g Tr. 78:8-19).) In these circumstances, no matter what scenario is credited, *urgent* concern about the children's location and well-being is not apparent and cannot be inferred from officers' actions to gain more information about them—officers knew at the very least that Overstreet would have a way to check on the children yet the potential destruction of evidence delayed the initial contact with her.

Turning now to the Government's specific arguments discounting Defendant's suggestion "that the officer's concern for the whereabouts and safety of Gilliam's children was but a ruse to gain entry into Gilliam's residence" (Doc. 96 at 22), the Government contends that Defendant's testimony is self-serving, Basheen Brown's testimony is immaterial to the officers' reasonable knowledge before they entered 374 North Main Street, and Connie Overstreet's testimony would, at most, be a partial rebuttal to exigent circumstances (*id.* at 23).

Regarding Gilliam's testimony, the Government concludes that

[h]is claim that he did not tell Detective Palka that his children were home alone is inconsistent with the clear statements Gilliam made during the recorded conversation with the C.I. It is also inconsistent with all the actions taken by police during the investigation, which clearly demonstrate a belief that the children were in danger.

(Doc. 96 at 23.)

The Government's conclusion is problematic for several reasons.  First, the Government does not identify what "clear statements" made in the recorded conversation are contradictory.  Second, upon review of the transcript of the recorded conversation, the Court finds no inconsistency between Defendant's statements made in the conversation with the CI and his testimony that he did not tell Palka that his children were home alone: the transcript shows that nothing in the conversation can be construed to suggest that his children were, or would be, left home alone.  As noted above, a fair reading of the conversation indicates that Defendant would be leaving Wilkes-Barre and passing through

Pittston to meet his children.  (*See* Doc. 98-1.)  There is no mention of "home" or "alone"

anywhere in the conversation.  (*Id.*)  Third, *some* actions taken by police during the

investigation demonstrate a belief that the children *could be* in danger.  However, as

discussed above, no clear and consistent pattern emerges exhibiting police concern for the

children's well-being in the execution of the buy-bust and subsequent events.  Thus, the

Court cannot conclude that Defendant's testimony is undermined by the recorded CI

conversation or actions taken by police during the investigation.

The Government's contention that Basheen Brown's testimony is immaterial to the

officers' reasonable knowledge before they entered 374 North Main Street (Doc. 96 at 23)

fails to take into account the relevance of Brown's testimony as to the manner in which

officers entered the house, the validity of officers' actions after they entered the residence,

and the reasonableness of the proffered basis for the initial entry and those which followed,

i.e., why they unlocked the door and entered without a warrant and continued with a sweep

of the house and unlocked another door after they were told no children were there.  The

relevance of Brown's testimony is exemplified by his averments that officers asked the

question about children *before* they continued the search on the upper floors of the house

and unlocked the door to the room they believed to be Defendant's.  (Doc. 90 at 198-99,

206-07 (Hr'g Tr. 198:15-199:6, 206:20-207:2).)  The Government's conclusion that Brown's

testimony, if anything, supports the claim that they were legitimately looking for children is

diminished when it is considered that Brown testified that he was asked one question--

"where are the kids at?" and he was not asked about children again after he responded that there were no children in the house.  (*Id.*)

The Government acknowledges that, if believed, Overstreet's claim that she told Ference that Defendant's children were with her "might serve to undermine the Government's theory that exigent circumstances existed to enter Gilliam's residence."  (Doc. 96 at 23.)  However, the Government contends that, even if true, Overstreet's assertion that she told Ference that she had the children

> would be but a partial rebuttal to exigent circumstances.  That is to say, even had Overstreet advised Officer Ference that she had Gilliam's children, her refusal to allow the children in the presence of law enforcement officers would have meant that the officers had at best, conflicting information as to the whereabouts of the children.  The children's father indicated that they were at his residence alone, and the father's girlfriend indicated that she had custody of the children.  In such circumstances, the exigency of the situation was such as to justify continued search for the children.

(Doc. 96 at 23-24.)

The Government proceeds to weigh the testimony of Overstreet and Ference, stating that Overstreet's testimony about the conversation "is less than truthful in her telling."  (Doc. 96 at 24.)   After a detailed review of Overstreet's testimony, the Government reviews Overstreet's employment history and relationship with Defendant.  (Doc. 96 at 24-27.)   The recitation includes the facts that Overstreet is a bail bondsman who is dating a known felon with multiple vehicles living in a city to which he has no known ties.  (*Id.* at 27.)   None of these "facts" make Overstreet less credible on the issues in this case.

The Government implies that Overstreet's testimony is less than credible because she decided, upon learning that police were at Defendant's residence, to take the children to their grandmother in Rome, New York, rather than to the residence in Wilkes-Barre, and she "made no effort to find out what happened to her boyfriend, nor confirm with police that she had Gilliam's children and they were safe." (Doc. 96 at 27.)  No suggested inference is warranted based on Overstreet's decision to take the children to their grandmother: she knew at that point that something had happened to Defendant, she testified that she also knew then that the police had misled her, and she made the best decision she could with limited information (Doc. 90 at 43 (Hr'g Tr. 43:12-23)).  Though the Government may disagree with Overstreet's judgment, in the circumstances presented, her judgment that the best course of action, which had to be decided quickly, was to take the children to their grandmother in New York, the place where they started their day (*id.* at 10 (Hr'g Tr. 90:18-23)), does not undermine her credibility.

The Government's assertion regarding Overstreet's lack of concern about Defendant and lack of contact with police does not properly consider the circumstances at play or testimony of record.  The Government does not know that Overstreet made no effort to find out what happened to Defendant—the Government only knows that she did not seek further information from the police whom she said she thought had misled her.  Moreover, though Overstreet may not have initiated contact with police, she testified that a Kingston police

officer contacted her shortly after midnight on July 22, 2017. (Doc. 90 at 26-27 (Hr'g Tr.

26:21-27:2).) She recalled the conversation as follows:

> He stated that he was calling to let me know where Larry was at. I informed
> him that I was aware of that, at that point, and I was upset with him for calling
> me—lying to me, telling me that he had been in a terrible accident. And he told
> me, at that time, it was not him who called me and told me that, he had no idea
> what I was talking about.

(*Id.* at 27 (Hr'g Tr. 27:7-12).) This conversation confirms that Overstreet had no reason to

seek information from police about Defendant—she was aware of the situation from other

sources.

The Government's assertion that Overstreet made no effort to confirm with police

that she had the children is of no significance to the Court's analysis. The Court finds that

Overstreet credibly testified that she had already told Ference that she had the children, and

there is no dispute that numerous people at the residence with the police knew that she had

the children. In these circumstances, Overstreet would have no reason to believe that she

needed to communicate further with officers. Thus, the bases upon which the Government

seeks to undermine Overstreet's credibility are unavailing.

The Government portrays Ference's testimony as consistent with a belief that

Defendant's children were in danger. (Doc. 96 at 28-29.) The Government points to the

following: Ference remained in Wilkes-Barre looking for the children after he spoke with

Overstreet; when provided information about the Toyota rental car, he located the vehicle

and identified a nearby house with lights on; he knocked on the door and when no one

answered he used Defendant's keys to gain access to the house; Ference then announced

his presence and asked someone to come to the door; when no one did, he entered the

residence to search for Defendant's children; he asked about the children; and he cleared

the house because of the dangerous environment.  (Doc. 96 at 28.)  While these facts are

consistent with an attempt to locate Defendant's children, they are also consistent with a

prime motivation of attempting to locate Defendant's Wilkes-Barre residence and the

presence of drugs.  Once the residence was located, Ference's question about children

may be demonstrative of genuine concern for the well-being of Defendant's children or *any*

children present in a residence about to be searched by numerous officers, but the question

is also consistent with the after-the-fact professed reason for gaining entry removed from

any particular concern about Defendant's children.[6]

In sum, the Government's attempt to show that Ference was more credible than

Overstreet is not supported by the record.  Keeping in mind that the essential question is

whether officers "reasonably . . . believe[d] that someone [was] in imminent

danger," *Couden,* 446 F.3d at 496, that is, they thought that a "true emergency" existed

such that opening the door and entering the premises without a warrant was necessary,

---

[6] According to Brown, officers asked a single question about children--"where are the kids at?" to which he responded that there were no children in the house before they continued the search on the upper floors of the house and unlocked the door to the room they believed to be Defendant's.  (Doc. 90 at 198-99, 206-07 (Hr'g Tr. 198:15-199:6, 206:20-207:2).)

*Simmons,* 661 F.3d at 157, the record evidence does not support a finding that officers reasonably believed that a true emergency existed.

As discussed previously, other than Palka's testimony that he thought the children could be in the car and this presented a dangerous situation, there is no evidence or testimony that officers took any pre-bust precautions regarding the children or sought information about their whereabouts until later. Ference was apparently dispatched to Wilkes-Barre with another officer to look for the children *before* Palka talked with Defendant about the children's whereabouts. Palka's testimony about when a plan was formulated to find the children is somewhat conflicting. On direct examination, he stated that, before he talked to Defendant, officers began to formulate a plan and dispatched Officers Miller and Ference to try to find the house on North Main Street (because they had a "very strong indication he was living on North Main Street") where they assumed the children were when they were not with Defendant at the buy-bust. (Doc. 90 at 74-77 (Hr'g Tr. 74:15-77:15).) On cross-examination, Palka was asked the following question: "The first time–in the search warrant and in the incident report—the first time there's any mention of a plan to find the children is after the conversation with Mr. Gilliam supposedly takes place at Kingston PD; correct?" (*Id.* at 107-08 (Hr'g Tr. 107:24-108:3).) Palka responded "[c]orrect, that's when we knew we did not have the kids." (*Id.* at 108 (Hr'g Tr. 108:7-9).)

Testimony does not show that Palka ever explored Overstreet's connection with the children with Defendant or otherwise discussed the children's well-being or precise

whereabouts with Defendant.  If, in fact, Palka believed a five-year-old and twelve-year-old were alone, after dark, at an unknown location with no indication that an adult would be tending to them, more extensive action to ascertain their location would be expected.  As discussed above, Palka's own assertions regarding his receipt of the information about Overstreet are conflicting (Doc. 37-1 at 7; Doc. 90 at 79 (Hr'g Tr. 79:1-5)), and he did not demonstrate any urgency in contacting her when he at least knew that she would have a way to check on Defendant's children (Doc. 90 at 78 (Hr'g Tr. 78:6-7)).

In the same vein, when Palka was asked about whether he had a conversation with Ference after Ference talked with Overstreet, the children's whereabouts and location did not seem of paramount importance.  Palka said that Ference told him she refused to have Ference go to her but he was going to meet her at the police station and "[Ference] never said anything about her having the children."  (*Id.* at 80 (Hr'g Tr. 80:11).)  Based on Palka's version of his conversation with Defendant, he at least knew that Overstreet had some connection with the children and presumably had a way to check on them, yet he does not say that *he asked* Ference what Overstreet said about the children or otherwise indicate that the children were discussed in the conversation between he and Ference.  Again, this does not demonstrate a sense of urgency about the children or that they were the prime concern at the time.

Ference's own testimony about the substance of the call with Overstreet is similarly curious: he says that he "kept asking, I need to know where the children are, if the children

are safe" (Doc. 90 at 133 (Hr'g Tr. 133:11-13)), but he doesn't say that he asked if they were at Defendant's residence or say that Overstreet directly refused to give him information.  Rather, he says only that "she didn't give me any indication of where they were of if she had the children." (*Id.* (Hr'g Tr. 133:13-14).)  Notably, even if Ference chose not to say that Defendant wanted her to check on the children (information which Palka would presumably have passed on to Ference) because he did not want to reveal details of Defendant's situation, he could have, and apparently did not, ask if she had a way to check on the children and make sure they were safe.  Nor is there any indication that Ference asked if the children were alone somewhere when the children being alone with dangerous drugs potentially in the same location was the professed concern about Defendant's alleged statement about his children being home alone.  If the children's well-being was the driving force behind the inquiry, one would expect that Ference's conversation with Overstreet would have included additional questions and requests of Overstreet which he would have shared with Palka.

After Ference's conversation with Overstreet, he expected a meeting with her at the Wilkes-Barre Police Department at which he presumably hoped to learn more about the children.  Yet evidence of record does not show that he or anyone else ever cancelled this meeting or further pursued obtaining information about the children's situation after gaining entry to the North Main Street residence.  While the absence of evidence on both fronts is curious, the officers' apparent lack of concern about the children after they completed the

search of the house is particularly perplexing.  Though Palka and Ference allegedly

believed, based on what Defendant allegedly told Palka, that Defendant's children were

alone in a house where Defendant stayed sometimes, and Palka and Ference claimed it

was urgent to find them because of the extremely dangerous drugs dealt by their father

which they presumed to be present where he stayed, officers did nothing to ascertain the

children's whereabouts after failing to find them at 374 North Main Street.  In other words,

after the search, officers still had a situation where they believed that a known dealer of

extremely dangerous drugs had his children with him just ten minutes before the buy/bust

and those children were alone in an unknown location where he had left them.  In this

scenario, no evidence or testimony suggests that the possibility had diminished that the

dangerous drugs dealt by Defendant were present in the children's unknown location, but

officers conducted no further inquiry into their location or well-being.  Thus, the officers'

inaction indicates that what had been exigent was no longer of any concern.  In sum, the

officers' post-search inaction regarding Defendant's children suggests that they found what

they were looking for in the search.  Although consideration of what officers did not do after

the search of 374 North Main Street does not go to what the officers reasonably knew when

they entered the residence, their later behavior is relevant to the credibility of the officers'

professed concerns prior to entry.

Turning now to the officers' conduct following their initial entry into 374 North Main

Street, the Government does not explain why, if the initial entry was exigent, the exigencies

as to that location would not have dissipated once officers were told there were no children in the house.  *See Mallory*, 765 F.3d at 384.  Brown testified that the officers asked him "where are the kids at?" during his first encounter with them in the dining room and he was not questioned further about kids after he responded that there were no kids in the house. (Doc. 90 at 198-99 (Hr'g Tr. 198:14-199:6).)   According to Ference, officers conducted an initial sweep of the residence before asking about children and, after the residents were gathered in the dining room, they were asked if they knew where Defendant's children were. (*Id.* at 138 (Hr'g Tr. 138:4-8).)  Thus, under either version of events, officers did not ask probing questions about Defendant's children before unlocking and entering Defendant's room and offered no testimony as to why they did not believe the children were not in the house after being told that was the case.  In these circumstances, evidence is lacking that the officers could have reasonably believed that a "true emergency" existed which warranted entry into Defendant's locked room.  *Mallory*, 765 F.3d at 383-84.

Importantly, while the Government alleges problems with each defense witness's individual testimony, the Government does not point to contradictions in the facts cited by the defense witnesses when compared with the others or point to any assertion made by a witness that was factually inaccurate.  As noted by Defendant, the Government provides no plausible reason why Defendant would have told Palka that his children were at a house in Wilkes-Barre alone when he knew they were with Connie Overstreet in Scranton and no

plausible reason why Connie Overstreet would withhold information regarding the children. (Doc. 102 at 10-12.)

Based on the evidence of record, the Court finds that the officers proceeded without proper justification when they entered 374 North Main Street without a warrant.[7] As to the central question of whether the Government has proven by a preponderance of the evidence that the officers conducted the warrantless search in a manner consistent with the Fourth Amendment, the evidence shows that the officers' alleged assessment that a true emergency existed was neither credible nor objectively reasonable. A reasonable officer considering the facts ascertainable upon a reasonable investigation would not have concluded that warrantless entry was necessary to address a true emergency related to Defendant's children. Because the Government did not show that officers acted on a *reasonable* belief that Defendant's children were in imminent danger," *Mallory*, 765 F.3d at 383–84, the Government has not established by a preponderance of the evidence that exigent circumstances justified the warrantless search of 374 North Main Street, and, thus,

---

[7] On direct examination at the suppression hearing, Defendant said that, sometime after his second conversation with Palka, he was taken to the office of Palka and Kotchik. (Doc. 90 at 176-77 (Hr'g Tr. 176:19-177:3).) He testified that Kotchik received a cell phone call in his presence which was about the search of the house on North Main Street. (*Id.* at 177 (Hr'g Tr. 177:7-10).) When asked what his impression was of what was being said, Defendant responded "I could recall him saying something of the nature, Oh, you did it this way, oh, okay, well, all right, it is what it is, and he shrugged his shoulders and hung up." (*Id.* (Hr'g Tr. 177:11-14).) Defendant said that Kotchik told him that officers at the house had "found more of the pink stuff." (*Id.* (Hr'g Tr. 177: 15-20).) No cross-examination on this testimony took place.

the warrantless entry and search of the residence was not reasonable under the Fourth Amendment.

Having established that a Fourth Amendment violation occurred, the Court must now address whether evidence which was discovered subsequent to the search must be suppressed.

## B. Suppression of Evidence

Defendant asserts that "all evidence seized from the search of 374 North Main Street following the issuance of the search warrant must be suppressed as fruit of the poisonous tree, because absent the information about the tainted evidence, the warrant lacked probable cause." (Doc. 37 at 28.)   The Government argues against suppression on two grounds: 1) suppression is not warranted because the evidence at issue would have been discovered even if the officers had not made the warrantless entry (Doc. 40 at 23); and 2) the Government can rely on the good faith exception to the exclusionary rule to avoid the suppression of evidence which Defendant contends was obtained illegally (*id.* at 29). [8]

The suppression of evidence based on a violation of the Fourth Amendment is governed by the exclusionary rule which is a prudential doctrine designed to enforce the Fourth Amendment.   *United States v. Werdene*, 883 F.3d 204, 213 (3d Cir. 2018) (citing

---

[8] The Government does not renew this argument in its post-hearing supplemental brief.  (*See* Doc. 96.)  Nor did the Government reply to Defendant's post-hearing argument that the inevitable discovery analysis is inappropriate here.  (*See* Doc. 97 at 34.)

*United States v. Martinez-Zayas*, 857 F.2d 122, 136 (3d Cir. 1988); *United States v. Franz*,

772 F.3d 134, 145 (3d Cir. 2014)).   The exclusionary rule

> "prevent[s] the government from relying at trial on evidence obtained in violation
> of the [Fourth] Amendment's strictures." *Franz*, 772 F.3d at 145. However, the
> rule is *not* intended to remedy Fourth Amendment violations, and does not
> necessarily apply each time a violation occurs. *See Herring v. United States*,
> 555 U.S. 135, 140, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Put differently,
> "there is no constitutional right to have the evidentiary fruits of an illegal search
> or seizure suppressed at trial." *United States v. Katzin*, 769 F.3d 163, 170 (3d
> Cir. 2014) (en banc); *see Davis v. United States*, 564 U.S. 229, 236, 131 S.Ct.
> 2419, 180 L.Ed.2d 285 (2011) (noting that the Fourth Amendment "says
> nothing about suppressing evidence obtained in violation of [its]
> command."); *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 82
> L.Ed.2d 677 (1984) ("[T]he use of fruits of a past unlawful search or seizure
> 'work[s] no new Fourth Amendment wrong.' " (quoting *United States v.
> Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ) ).
>
>        Rather, the exclusionary rule aims to *deter* government violations of
> the Fourth Amendment. *See Krueger*, 809 F.3d at 1125 (Gorsuch, J.,
> concurring) ("Even when an unreasonable search does exist, the Supreme
> Court has explained, we must be persuaded that 'appreciable deterrence' of
> police misconduct can be had before choosing suppression as the right remedy
> for a Fourth Amendment violation." (quoting *Herring*, 555 U.S. at 141, 129
> S.Ct. 695) ); *see also Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437,
> 4 L.Ed.2d 1669 (1960) ("The [exclusionary] rule is calculated to prevent, not
> repair.")

*Werdene*, 883 F.3d at 215.

Under Supreme Court precedent, "the exclusionary rule encompasses both the

'primary evidence obtained as a direct result of an illegal search or seizure' and . . .

'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of

the poisonous tree.'" *Utah v. Streiff*, ---U.S.---, 136 S.Ct. 2056, 2061, 195 L Ed. 2d 400

(2016) (quoting *Segura v. United States,* 468 U.S. 796, 804 (1984)).   *Streiff* added that

the significant costs of this rule have led us to deem it 'applicable only ... where its deterrence benefits outweigh its substantial social costs.'" *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (internal quotation marks omitted). "Suppression of evidence ... has always been our last resort, not our first impulse." *Ibid.*

136 S. Ct. at 2061.  The Court has recognized several exceptions to the rule:

First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source.  *See Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. See *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Third, and at issue here, is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson, supra,* at 593, 126 S.Ct. 2159.

*Strieff*, 136 S. Ct. at 2061.

Further, the "good-faith exception" to the exclusionary rule effectuates the balance

relevant to deterrence:

Where the particular facts of a case indicate that law enforcement officers act[ed] with an objectively reasonable good-faith belief that their conduct [was] lawful, or when their conduct involve[d] only simple, isolated negligence, there is no illicit conduct to deter. In such circumstances, the deterrence rationale loses much of its force and exclusion cannot pay its way. Alternatively, where law enforcement conduct is deliberate, reckless, or grossly negligent or involves recurring or systemic negligence, deterrence holds greater value and often outweighs the associated costs.  Put differently, exclusion is appropriate only where law enforcement conduct is both sufficiently deliberate that deterrence is effective and sufficiently culpable that deterrence outweighs the costs of suppression.  Thus, determining whether the good faith exception applies requires courts to answer the objectively

ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.

*United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014) (internal quotation marks and citations omitted).   *Katzin* held that the exclusionary rule does not apply where officers act "upon an objectively reasonable good faith belief in the legality of their conduct." *Id.* at 182.

"The government shoulders the burden of establishing that suppression is unwarranted." *Taylor v. Alabama,* 457 U.S. 687, 690 (1982); *see also United States v. Dupree*, 617 F.3d 724, 738–39 (3d Cir. 2010). In challenging suppression, the Government "must meet its burden by a preponderance of the evidence." *United States v. Pelullo*, 173 F.3d 131, 138 (3d Cir. 1999).

The Court will first address the Government's argument that the Court should not suppress evidence pursuant to the independent source doctrine.

### 1.  Inevitable Discovery Doctrine

The Government first asserts that the exclusionary rule does not apply in this case because the evidence would have been discovered even if the officers did not make a warrantless entry. (Doc. 40 at 23.)

The Supreme Court explained the inevitable discovery exception to the exclusionary rule in *Nix v. Williams,* 467 U.S. 431 (1984): "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444.  As noted in *United States v. Vasquez De Reyes,*

149 F.3d 192 (3d Cir. 1998), "[t]he rule so applied permits the court to balance the public

interest in providing a jury with all relevant and probative evidence in a criminal proceeding

against society's interest in deterring unlawful police conduct." *Id.* at 195 (citing *Nix*, 467

U.S. at 443).  The underlying rationale for the inevitable discovery rule is that "the

exclusionary rule ensures that the police should not be in a better position as a result of

their illegal action, but neither should they lie in a worse position." *Vasquez De Reyes*, 149

F.3d at 194–95; *see also United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing

*Vasquez De Reyes*, 149 F.3d at 195).  The Circuit Court further explained that the

Government's burden can be met

> if the government establishes that the police, following routine procedures,
> would inevitably have uncovered the evidence. *See, e.g., United States v.
> Martinez–Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987).
>
> . . . Proof of inevitable discovery involves no speculative elements but
> focuses on demonstrated historical facts capable of ready verification or
> impeachment and does not require a departure from the usual burden of proof
> at suppression hearings. The exception requires the district court to determine,
> viewing affairs as they existed at the instant before the unlawful search, what
> would have happened had the unlawful search never occurred. [*United States
> v. Kennedy*, 61 F.3d 494, 498 (6th Cir.1995)].

*Vasquez De Reyes*, 149 F.3d at 195.  The Third Circuit Court agreed with the Seventh

Circuit which stated in *United States v. Jones,* 72 F.3d 1324 (7th Cir.1995), that

"[s]peculation and assumption do not satisfy the dictates of *Nix . . . .* Inevitable discovery is

not an exception to be invoked casually, and if it is to be prevented from swallowing the

Fourth Amendment and the exclusionary rule, courts must take care to hold the government

to its burden of proof." *Id.* at 1334 (citations omitted); *Vasquez De Reyes*, 149 F.3d at 196.

> The Government specifically contends that
>
> [w]hen Police Officer Ferrence learned the key worked for the defendant's
> house, there was sufficient probable cause to get a search warrant. A warrant
> that likely would have been approved within hours while law enforcement
> secured the outside of the premises, preventing any evidence from leaving the
> location. Therefore, even if the court rules the entry and sweep violated the
> fourth amendment, the contraband would have been inevitably discovered
> making the defendant's claim that the evidence should be suppressed as fruit
> of the poisonous tree incorrect.

(Doc. 40 at 23.)  Defendant discounts the Government's argument because the Government

does not take into account that, before trying the key in the lock at 374 North Main Street,

officers did not know an actual address for Defendant.  (Doc. 41 at 9.)

The Court is not persuaded by the Government's argument because it does not

show how it would have discovered 374 North Main Street to be Defendant's residence at

the time in question if it had not turned the key in the lock.  As set out above, the exception

requires the Court "to determine, viewing affairs as they existed at the instant before the

unlawful search, what would have happened had the unlawful search never occurred."

*Vasquez De Reyes*, 149 F.3d at 196 (citation omitted).  Here, "at the instant before"

Ference put the key in the lock and turned it, an action which the Court has determined to

be an unlawful search, *see supra* pp. 25-26, officers did not know they were at Defendant's

house.  Thus, if the unlawful search never occurred, officers would not have had an address

for which to seek a search warrant and the scenario painted in the Government's

anticipated chain of events--obtaining a warrant within hours and law enforcement securing the house in the meantime--is left without a foundation.  On these facts, the Court cannot conclude that the Government has shown by a preponderance of the evidence that the inevitable discovery rule applies in this case.  Because the Government has failed to meet its burden of proof of showing that suppression is not warranted under the inevitable discovery rule, the Court will turn to the Government's argument regarding the good faith exception to the exclusionary rule.

## 2.  Good Faith Exception

The Government asserts that, if the Court finds a Fourth Amendment violation, it can rely on the good faith exception to the exclusionary rule to avoid suppression.  (Doc. 40 at 29-31.)  In his post-hearing brief, Defendant argues that the exception cannot apply in this case for numerous reasons.  (Doc. 97 at 36.)

The Supreme Court held In *United States v. Leon*, 468 U.S. 897 (1984), that the exclusionary rule will generally not apply when law enforcement conducts a search pursuant to a search warrant later found to be invalid.  *Id.* at 922 (concluding that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion").  However, the Court cautioned that an officer's "reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, . . . and it is clear that in some circumstances the officer will have

no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922-23 (citation omitted).

Among the circumstances where suppression remains an appropriate remedy is when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." 468 U.S. at 923 (citing *Franks v. Delaware*, 468 U.S. 154 (1978)). The exception also applies where the officer relies on a warrant "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (citing *Brown v. Illinois*, 422 U.S. 590, 610–611 (1975)).[9]

*Leon* clarified that its references to "officer" should not be read too narrowly, explaining that

> [i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.

468 U.S. at 923 n.24 (citing *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)).

---

[9] The parties focus on the exceptions identified in the text. (*See* Doc. 37 at 35; Doc. 40 at 30-31; Doc. 97 at 36-39.) *Leon* identified two other circumstances in which the good faith exception will not apply: "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979), . . .[and where,] depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

The Court of Appeals for the Third Circuit explained in *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002), that

> [w]hen the Supreme Court announced the good faith exception in *Leon*, it weakened the exclusionary rule, but it did not eviscerate it. 'Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble.'" *United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir.1996). And particularly where the affiant is also one of the executing officers, it is somewhat disingenuous, after having gone to the magistrate with the paltry showing seen here, to suggest, as the government suggests, that at bottom it was the magistrate who made the error and the search and seizure are insulated because the officer's reliance on that error was objectively reasonable. That aside, "[T]he good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all known facts." *Id.* at 1273. The objective standard "requires officers to have a reasonable knowledge of what the law prohibits." *Leon,* 468 U.S. at 919–20 n. 20, 104 S.Ct. 3405.

277 F.3d at 437–38.

Here the Search Warrant was issued on July 22, 2017, based on the Affidavit of Probable Cause submitted by Palka and Ference. (*See* Doc. 37-1 at 1.) As noted previously, the warrant was executed by the Pennsylvania State Police Clandestine Lab Team on the same day. (Doc. 37-2 at 2.) Numerous items were seized in the search, including drugs and firearms which provided the basis for three counts contained in the August 29, 2017, Indictment. (Doc. 1 at 3-5; Doc. 37-1 at 11-13.) Ference issued the Receipt/Inventory of Seized Property on July 22, 2017. (Doc. 37-1 at 11-13.)

The Affidavit contains few assertions related to the children, the first of which is found on the fourth page of the six-page narrative (*see id.* at 4-9) when Palka talks about his first conversation with Defendant after the arrest.

After being advised of his Miranda warnings, Det. Palka spoke with Mr. Gilliam. Det. Palka advised Mr. Gilliam that he was aware Mr. Gilliam had a son that was 4 years old.  Mr. Gilliam corrected Det. Palka, saying his son was 5 years old.  Det. Palka advised Mr. Gilliam that Police knew he was staying in a house on North Main Street and asked if there was presently anyone else in the house because if Officers conducted a search of the residence, we wanted to know if anyone was inside and if they posed a danger to Officers.  Mr. Gilliam stated that were only kids inside the house.  Det. Palka asked how old the oldest person in the house was and Mr. Gilliam stated "twelve."  Det. Palka asked if anyone inside of the residence would be violent towards Officers and he stated "No."  Det. Palka asked if there were any dogs in the house and Mr. Gilliam stated "No."  Then Mr. Gilliam asked, "Wait a minute, what house are you talking about?"  Det. Palka stated, "The house on North Main Street."  Mr. Gilliam stated, "But I don't actually live there, I just stay there sometimes."  Det. Palka then advised that it didn't matter, that he was observed leaving there and followed to the buy and then followed directly back there after Police purchased the drugs from him.  Palka then stated, "I want to know, how much of that pink powder substance is in the house."  Mr. Gilliam stated, "I don't want to say anything to incriminate myself" and refused to answer any further questions, but wanted to make a phone call to a female named Connie Ovalstreet, to check on his kids."

(Doc. 37-1 at 7.)  Regarding events at 374 North Main Street, the Affidavit states the

following:

>       Officers proceeded to the address directly in front the vehicles known to belong to Gilliam and went to the door to conduct a welfare check on the children that Gilliam advised officers were in the residence alone.  Officers knocked several times, but nobody came to the door.  Officers checked and the door was locked.  At this time, Officers believed that several children, one being a five-year-old (whose age was confirmed by Gilliam and also estimated by Brown to be approximately 4 years old and present for a drug transaction by Mr. Brown who purchased the pink substance from Gilliam) were present in the residence with heroin, fentanyl and carfentanil, which are known to Officers to be extremely dangerous and even fatal through mere contact with human skin and pose an additional risk if the substance were to become airborne.  Officers tried the keys in the front door that were confiscated from Mr. Gilliam at the time of his arrest.  One of the keys fit in the front door lock and opened the door.  Officers entered the house and conducted a sweep to look for the

children.  Officers encountered several people inside but no children.  In one open room in the house, officers witnessed in plain view, crack cocaine, a scale, a magic bullet blender with pink residue consistent with the substance sold by Gilliam and a surgical mask.  Officers noticed that on the 2nd and 3rd floors of the house, each door was fitted with a key and dead bolt lock.  Knowing that Mr. Gilliam, by his own admission, stayed in a room of this house, finding narcotics, including the extremely dangerous and possibly deadly pink substance, and drug paraphernalia used in the manufacturing and preparation of narcotics, officers continued to search for the children and make sure they were safe.  Officer Ference then tried the keys found in Mr. Gilliam's possession in a door that was dead bolted on the second floor.  One of the keys opened the door and Officers saw a BMW motorcycle helmet and a receipt for service work on a 2016 BMW 750 – the same make and model vehicle officers observed Gilliam driving – with Larry Gilliam's name on it from Wyoming Valley Motors.

(Doc. 37-1 at 8.)

The Government specifically argues that, although Defendant claimed that the two scenarios identified in *Leon* which are set out above are applicable,

Defendant provides nothing substantive to support these arguments. [Doc. 37 at 35.] Here, the officers did not mislead the Magistrate judge and had no reason to believe anything in their affidavit was false. Additionally, the search warrant affidavit had sufficient probable cause separate from what the officers learned from the protective sweep of the defendant's home.

(Doc. 40 at 30-31.)  The Government further argues that officers conduct in this case was similar to the detectives in *Illinois v. Krull*, 480 U.S. 340 (1987), where the Court stated that the "Fourth Amendment exclusionary rule does not apply to evidence obtained by police who acted in objectively reasonable reliance upon statute authorizing warrantless administrative searches, but which is subsequently found to violate Fourth Amendment."

(Doc. 40 at 31.)  In support of the statement, the Government asserts that here "[t]he

investigators acted as any similarly situated officer would.  The task force did what they believed was necessary to keep children they believed to be in the defendant's home safe. The defendant's claim that they acted in bad faith is incorrect." (*Id.*)

The Government's argument implies that it is Defendant's burden to show that the good faith exception does not apply in this case.  As set out above, the Government "shoulders the burden of establishing that suppression is unwarranted" and "must meet its burden by a preponderance of the evidence." *Taylor,* 457 U.S. at 690; *Pelullo*, 173 F.3d at 138.

The argument is further flawed in that it necessarily follows from the Court's determination that evidence did not show that the officers' determination that a true emergency existed was either credible or objectively reasonable that the investigators here did not act "as any similarly situated officer would." (Doc. 40 at 31.)  For the same reason, the claimed belief that officers did what was necessary to keep the children safe is unavailing.  Further, the Government's conclusory statement that "the officers did not mislead the Magistrate Judge and had no reason to believe anything in their affidavit was false" (Doc. 40 at 30-31) is insufficient to carry its burden on whether the good faith exception applies here.  This is particularly so when the Affidavit is reviewed to assess whether the Magistrate Judge was misled by information contained in the Affidavit or omitted from it.

The recitation of facts related to officers' knowledge of Defendant's North Main Street residence is problematic for several reasons. Palka says that, at the outset of the conversation, he advised Defendant that police knew he was staying in a house on North Main Street and, later in the conversation, Defendant asked what house he was talking about. (Doc. 37-1 at 7.) This sequence is not logical or consistent with Palka's testimony. It is not logical because, if Palka had said "the house on North Main Street" at the outset, Defendant would not likely ask shortly thereafter what house he was being asked about. The sequence is not consistent with Palka's testimony where Palka stated that it was *after* he asked questions about the house that Defendant asked "What house are you talking about". (Doc. 90 at 76 (Hr'g Tr. 76:19-21).) In his testimony, Palka stated that he "had to bluff" when asked to identify the house and that's when he said "the house on North Main Street." (*Id.*) Notably, the Affidavit does *not* say that Palka was bluffing when he presented this information to Defendant. Nor does the Affidavit say that Palka's statements to Defendant about being observed leaving the North Main Street location and being followed there were not factually accurate, something he clarified upon cross-examination. (*See supra* pp. 8-9.)

While the statements about the North Main Street location are technically not false because the Affidavit recites what Palka "advised" Defendant of rather than stating information as objective fact, the presentation of information is disingenuous because Palka does not indicate that he was "bluffing" when he so "advised" Defendant. However, insofar

as the statements about being observed at a North Main Street location linked Defendant's drug dealing to the location, if taken as truth rather than bluff, the statements would present a nexus to the Magistrate Judge which did not in fact exist until after the warrantless entry into 374 North Main Street.

Several additional omissions support a finding that the Magistrate Judge could have been misled by the Affidavit.  The affiants did not include the facts that they had contact information for Connie Overstreet, a person they reasonably should have known had information about Defendant's children, they delayed in calling her, and they eventually contacted her and set up a meeting.  The affiants did not include a timeline in the Affidavit which would have shown that the "welfare check" occurred long after they allegedly learned that Defendant's children were in the house on North Main Street.  The affiants did not include the fact that they were informed upon entering 374 North Main Street that there were no children in the house.

Further discounting the claim that the Government can rely on the good faith exception is the fact that the Government's bare-bones argument does not address the heart of the good faith exception, i.e., the "objective reasonableness" of the officers' reliance on the warrant.  *Leon,* 468 U.S. at 922-23.  The objective reasonableness of reliance on the warrant is undermined when it is considered that the actions of the affiants, Palka and Ference, are relevant in the good faith exception analysis, *see Leon,* 468 U.S. at 923 n.24, and the Court has determined that their pre-warrant actions were not objectively reasonable

and their testimony was less than credible.  Having found Palka and Ference less than

credible in the pre-warrant period, the Court cannot attribute objective reasonableness and

good faith to their recitation set out in the Affidavit of Probable Cause.  *Leon's* note that

nothing in the opinion "suggests . . . that an officer could obtain a warrant on the basis of a

'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances

under which the warrant was obtained to conduct the search," *id.*, also comes into play

here.  The affiants' selective recitation of facts and paucity of information relating to

exigency contained in the warrant application indicate that the situation here is one where

they relied on colleagues "ignorant of the circumstances under which the warrant was

obtained to conduct the search." *Id.*  As such, pursuant to guidance provided in *Leon,* the

affiants' lack of objective reasonableness weighs against application of the good faith

exception.

Finally, considering the matter of deterrence and *Leon's* direction that the objective

reasonableness of the officers who obtained the warrant was part of the good faith

exception calculation, 468 U.S. at 923 n.24, the Court's determination that officers' conduct

was not objectively reasonable and Palka and Ference were less than completely credible

indicates that this is not a case where "there is no illicit conduct to deter." *Katzin,* 769 F.3d

at 171.  Thus, in the circumstances presented by officers' actions and inactions on July 21,

2017, the "deterrence rationale" does not lose its force. *Id.*  Rather, here, the conduct of law

enforcement was deliberate and in violation of established Fourth Amendment precedent,

i.e., the type of conduct for which *Katzin* noted that "deterrence holds greater value and often outweighs the associated costs." *Id.* Thus, pursuant to the guidance provided in the Third Circuit's *en banc Katzin* decision that "exclusion is appropriate only where law enforcement conduct is both sufficiently deliberate that deterrence is effective and sufficiently culpable that deterrence outweighs the costs of suppression," *id.*, the facts of the case, including the testimony of Palka and Ference, indicate that suppression is justified. In other words, "this is not a case where officers acted upon an objectively reasonable good faith belief in the legality of their conduct," *id.* at 182, when they searched 374 North Main Street on July 21, 2017.

Given the course of events leading up to the unlawful entry and the officers' ongoing Fourth Amendment violations following the initial entry (including unlocking the room that proved to be Defendant's), suppression should deter officers from proceeding with warrantless searches without an adequate investigation and assessment of the circumstances and facts available to them. Further, the Court's rejection of what appears to be an after-the-fact exigent circumstances rationale for the warrantless entry has no deterrent effect on future similar conduct if the suspect rationale, once woven into a search warrant's affidavit of probable cause, is given a stamp of objective reasonableness going forward.[10] To paraphrase *Leon*, this would allow an officer to obtain a warrant on the basis

---

[10] As noted in *United States v. Loera*, 923 F.3d 907, 927 (10th Cir.),

of a curated narrative in an affidavit and "then rely on colleagues who are ignorant of the

circumstances under which the warrant was obtained to conduct the search." *Leon*, 468

U.S. at 923 n.24. *Leon* did not contemplate that the good faith exception to the exclusionary

rule would sanction such conduct by suppressing evidence, *id.*, and this Court has been

provided no basis for doing so here in that the Government has made no attempt to show

that the social cost of suppression outweighs the value of deterrence in this case. *See*

*Leon*, 468 U.S. at 907.

Nonetheless, the Court will briefly consider the social costs of exclusion identified in

*Katzin*, 769 F.3d at 171, where the Circuit Court stated that

> [t]hese costs often include omitting "reliable, trustworthy evidence" of a
> defendant's guilt, thereby "suppress[ing] the truth and set[ting] [a] criminal loose
> in the community without punishment." *Davis*, 131 S.Ct. at 2427. As this result
> conflicts with the "truth-finding functions of judge and jury," *United States v.*
> *Payner*, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), exclusion
> is a "bitter pill," *Davis*, 131 S.Ct. at 2427, swallowed only as a "last
> resort," *Hudson*, 547 U.S. at 591, 126 S.Ct. 2159.

*Katzin*, 769 F.3d at 171.

---

[w]hen a magistrate issues a warrant based on illegally obtained evidence, typically the
manner in which the affidavit evidence is obtained is not before the magistrate, and the
magistrate is not asked explicitly to endorse the evidence-gathering procedure. Even though
some disclosure of the evidence-gathering technique may have occurred, that is not
ordinarily the focus of an application for a warrant.

923 F.3d at 927.  On this basis, the Circuit Court was "unwilling to read a warrant as ratifying the
information-gathering process of a search that preceded it." *Id.*

Here the social costs include omitting reliable, trustworthy evidence seized from Defendant's room in the July 22, 2017, search, including weapons and drugs. (*See* Doc. 37-1 at 11-13.) However, this is not a case where Defendant will be "set loose in the community without punishment" as a result of suppression because two counts of the five-count Indictment will not be affected by suppression. (See Doc. 1.) Thus, the "truth finding functions of judge and jury" will be in play in determining Defendant's guilt or innocence on the remaining counts.

On balance, the Court concludes that deterrence benefits outweigh the social cost of suppression. Therefore, the Court will grant Defendant's Motion and evidence seized in the July 22, 2017, search of 374 North Main Street will be suppressed.

## V. CONCLUSION

For the reasons discussed above, Defendant' Motion to Suppress Physical Evidence (Doc. 36) will be granted. All evidence obtained by law enforcement from 374 North Main Street, Wilkes-Barre, Pennsylvania, on July 21, 2017, and July 22, 2017, will be suppressed. A separate Order is filed simultaneously with this Memorandum Opinion.

Robert D. Mariani
United States District Judge