UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | 3:17-CR-00258 |
| | : | (Judge Mariani) |
| v. | : | |
| | : | |
| LARRY GILLIAM | : | |

## GOVERNMENT'S MEMORANDUM OF LAW

## IN SUPPORT OF MOTION FOR RECONSIDERATION

The United States of America, by and through counsel, UNITED
STATES ATTORNEY DAVID J. FREED, and Todd K. Hinkley,
Assistant United States Attorney, states the following in support of
reconsideration of this Honorable Court's Memorandum Opinion dated
August 7, 2020. Doc. 103.

### Procedural History

The defendant, Larry Gilliam filed a Motion to Suppress Physical
Evidence on June 4, 2018. Doc. 36. The same was accompanied by a
brief in support. Doc. 37. Thereafter on July 18, 2018, the Government
responded by filing a brief in opposition. Doc. 40. Gilliam filed a reply
to the brief in opposition, and by Order dated November 9, 2018, the
Court directed Gilliam to file a supplemental brief in support of his

motion to specifically address his request for a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978). Doc. 42. Gilliam complied on December 7, 2018. Doc. 45. The Government filed a brief in opposition on March 27, 2019. Doc. 53.

A suppression hearing was held July 23, 2019, at the conclusion of which the Court requested counsel file supplemental briefs within 28 days of the publication of the suppression hearing transcript. The parties thereafter filed supplemental briefs, the Government on October 7, 2019 (Doc. 96), and in response the defense on November 4, 2019 (Doc. 102).

The Court issued an order granting the defendant's Motion to Suppress on August 7, 2020, (Doc. 104) accompanied by a Memorandum of Opinion (Doc. 103).

The Government moves the Court to reconsider its decision, citing clear error of law or fact.

### Argument

"[A] motion for reconsideration is 'not to be used as a means to reargue matters already argued and disposed of or as an attempt to

relitigate a point of disagreement between the Court and the litigant.'"[1] *Qazizadeh v. Pinnacle Health System*, 214 F.Supp.3d 292, 295 (M.D. Pa. 2016) citing *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002).  It "should not be used to try to get a 'second bite at the apple,', or to raise new arguments or evidence that could have been proffered prior to the issuance of the order in question." *Qazizadeh*, 214 F.Supp. 3d at 295-96, quoting *Kropa v. Cabot Oil & Gas Corp.*, 716 F.Supp.2d 375, 378 (M.D. Pa. 2010) and *McDowell Oil Serv., Inc. v. Interstate Fire & Cas. Co.*, 817 F.Supp. 538, 541 (M.D. Pa. 1993).  The Third Circuit has repeatedly held that "[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros*, 176 F.3d

---

[1] Despite there being no Federal Rule of Criminal Procedure specifically authorizing them, it is settled that "Motions for reconsideration may be filed in criminal cases." United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003).  Much of the law relied upon by the Court of Appeals and district courts in the Third Circuit deciding these motions in criminal cases comes from the civil sphere, where they are far more common. The Middle District of Pennsylvania's Local Rules expressly provide for Motions for Reconsideration. LR 7.10 provides that, "Any motion for reconsideration or reargument must be accompanied by a supporting brief and filed within fourteen (14) days after the entry of the order concerned."

669, 677 (3d Cir. 1999), citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985).

Accordingly, the party seeking reconsideration must show at least one of the following grounds: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion…; or (3) the need to correct a clear error of law or fact to prevent manifest injustice." *Quinteros*, 176 F.3d at 677, citing *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

Here, the Government being mindful of the limited purpose for such motions is compelled to request reconsideration given clear error of law or fact in the Court's Memorandum Opinion that if uncorrected will result in manifest injustice.

    A. Contrary to the finding of the Court, the Government provided specific argument, based on evidence in the record to support the proposition that adult individuals living in a house where a dangerous drug may be present gives rise to a "true emergency" in Fourth Amendment Terms.

As noted in the Memorandum Opinion, the Court chose to focus on arguments regarding the police's belief that exigent circumstances existed to conduct a cursory search of the residence only as it related to

a concern for the safety of the Defendant's children. (Doc. 103 at 28). In so deciding, the Court noted that "the Government presents no specific argument, beyond the existence and dangerousness of the drug, regarding the need to protect individuals other than Defendant's children. Because the Government has provided no authority to support the proposition that adult individuals living in a house where a dangerous drug may be present gives rise to a "true emergency" in Fourth Amendment terms ... the Court will focus on the arguments regarding Defendant's children." *Id.* (Citation omitted.)

But a review of the record shows that the Government during the suppression hearing and in its Supplemental Brief offered evidence of record, argument, and case law in support of the police officers' reasonable belief that exigent circumstances existed to enter the residence to protect *all* individuals who might be present. The uncontested testimony and evidence presented at the hearing demonstrated that (1) carfentanil can be absorbed through simple skin contact, or if being handled improperly may become airborne; (2) that the search of the residence the next day pursuant to a search warrant was conducted by the Pennsylvania State Police Clan Lab team

utilizing full protective gear designed to protect these adult law enforcement officers from exposure; and (3) that after that court-authorized search was complete a notice was posted at the residence that advised the public of the risk of exposure to dangerous substances inside the residence (Doc. 96 at 20).

Both police officers testified about the danger of exposure to carfentanil, and the Government offered into evidence Exhibit 5—the Pennsylvania Criminal Intelligence Center's bulletin warning law enforcement officers about the potential harmful effects associated with carfentanil.  Gov. Exhibit 5.  That bulletin indicated that "carfentanil, an analogue of fentanyl that is 100 times stronger then fentanyl and one of the most potent opioids known and commercially available, is believed to be the cause of multiple overdoses in the Commonwealth resulting in three deaths." *Id.*  The bulletin goes on to explain "[c]arfentanil is typically used by veterinarians to sedate elephants and other large animals; it is not approved for use in humans.  When handling carfentanil, veterinarians wear personal protective equipment including face masks, gloves, and aprons.  First responders and medical personnel should use extreme caution when handling drugs, syringes,

or other evidence since as little as a microgram, 1/1,000,000 of a gram, can affect a human. Naloxone will reverse a carfentanil overdose, but it requires multiple doses according to reports from emergency personnel." *Id.* In the recommendation section of the bulletin, it notes that "The Center for Disease Control (CDC) National Institute for Occupational Safety and Health (NIOSH) … recommendations include the use of 5 mm nitrile gloves and P-100 masks. It is recommended that first responders take the necessary steps to protect themselves when handling powder-like substances or suspected heroin that may contain fentanyl or fentanyl analogs." *Id.* Police testified that they had read the warning-bulletin prior to deciding how best to provide for the safety of any person who might be exposed to carfentanil during the buy/bust operation or in the residence where Gilliam was staying. Hr'g Tr. at 61 – 63; 135. The bulletin indicates that carfentanil endangers any person who might be exposed to it, not just children. Gov. Exhibit 5.

The Court says in its decision that the Government provided no authority to support the proposition that adult individuals living in a house where dangerous drug may be present gives rise to a "true emergency" in Fourth Amendment terms. Doc. 103 at 28 (citations

omitted).  However, in its brief the Government cited, among other cases having to do with exigent circumstances to justify entry of residences to secure adults from possible harm, the First Circuit case of *Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018).  *Hill* involved the entry of police into a residence when they believed a 28 year old resident was in danger of overdosing.  Hill 884 F.3d at 18.  In so finding the *Hill* Court clarified the so-called "emergency aid exception to the warrant requirement" to "mean that officers seeking to justify their warrantless entry need only demonstrate 'an objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" *Id.* at 19.

As mentioned above, both Officer Palka and Officer Ference testified about the lethal properties of carfentanil to *any individual* regardless of age – including the possibility that the carfentanil may become airborne as a hazard.  Officer Palka testified that, "When carfentanil and fentanyl started coming around and started being mixed with heroin, we got orders from the Luzerne County District Attorney to not field test any of those powders anymore, just because of the fact that if they just become airborne, they can get into your system

and you can die immediately." Hr'g Tr. at 61. Officer Palka went on to state that "[he and other law enforcement officers] were hearing stories of officers that would get on a traffic stop, and all of a sudden, a powder would be around, they would get it on their scanner and inhale it and overdose, and the other officers would have to use narcan to bring them back. So, yes, everybody was on edge about it for sure." *Id.* at 62. Officer Palka was sufficiently concerned that the substances he had purchased early in the investigation were carfentanil that he took the unprecedented (in his career) step of driving the substances to the lab the very next day and requesting an immediate examination to determine if he was dealing with carfentanil. *Id. at 64 – 65.* When Officer Palka confirmed that he was dealing with carfentanil via a telephone call with the Pennsylvania State Police chemist, he made a decision to modify his usual approach to these types of investigations. *Id.*

Indeed, the dangerousness of the carfentanil to the public drove the very conduct of the investigation from the start. Rather than his preferred method of conducting several buys off of an individual before making an arrest, Officer Palka's concern for "any officer who might

stop Mr. Gilliam … or people that he's selling it to, overdosing, him, himself touching it, anybody that comes into contact with that," led to the police's decision "to get it off the street quickly, do a bust buy and be over, rather than trying to do several controlled buys like we would normally do." *Id.* at 65 – 66.

Therefore, the Court erred in stating that the Government provided no support or argument for exigent circumstance related to both children and adults at the Gilliam residence. The record says otherwise.

> B. The Court's credibility findings and determination that Government law enforcement witnesses were "less than credible" is unsupported by the record, and overlooks evidence to the contrary.

As stated above, one legitimate purpose for a motion of reconsideration is the need to correct a clear error of law or fact to *prevent manifest injustice.*" *Quinteros*, 176 F.3d at 677, citing *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir. 1995) (emphasis added). The Court's Memorandum Opinion, to the extent it finds that Officer Palka's and Officer Ference's testimony was not credible, is unsupported by the record and contrary to the "weight of

the evidence" offered at the suppression hearing, "together with [reasonable] inferences, deductions, and conclusions to be drawn therefrom. *United States v. Britton*, No. 1:13-CR-0014, 2013 WL 1856532. At *1 (M.D. Pa. May 2, 2013), *aff'd*, 608 F. App'x 111 (3d Cir. 2015) (*citing United States v. Staten*, 181 F. App'x 151, 156 (3d Cir. 2006)).

The Court's finding that these law enforcement officers were less than credible in their testimony at the hearing where they explained why they conducted a protective sweep and cursory search of Gilliam's residence—due to a concern for the safety of Gilliam's young children and any adults who might be present—has potentially serious ramifications well beyond the suppression of evidence in this single case. Such findings may have lasting negative consequences to the professional law enforcement careers of both officers, who have unblemished professional records and outstanding professional reputations. An officer's credibility, integrity, and honesty are central to his ability to successfully practice as a law enforcement officer. In this case, there is no evidence that either officer acted other than out of a sincere belief that exigent circumstances existed. And the record is

replete with both officers expressing a genuine concern for the safety of Gilliam's children and any person who might be exposed to carfentanil. The Government contends that under the circumstances and evidence presented at the hearing, the officers' belief was reasonable and the evidence should not have been suppressed.

The record in this case shows that the police were genuinely concerned about the danger presented to anyone in the residence—children or adults—by the presence of carfentanil in the residence. Perhaps the most compelling evidence of this concern came from the testimony of the adult who first confronted the police after they entered the residence—a defense witness at the hearing—who stated that the very first thing police did upon entering the residence was ask, "Where are the children at?" Indeed, the Court in its opinion acknowledges that "some of the actions taken by police during the investigation demonstrate a belief that the children *could* be in danger" (Doc. 103 at 33) (emphasis in original), and that the "facts are consistent with an attempt to locate Defendant's children," and that Officer Ference's question about children "may be demonstrative of genuine concern for the well-being of Defendant's children or any children present in a

residence. . ." (Doc. 103 at 37). Yet the Court concludes that the officers were not credible in expressing that concern for safety. This conclusion was unwarranted based on the record in this case.

C. The Court's determination that the affidavit of probable cause to search the residence was misleading due to material omissions is not supported by the record.

This Court in its opinion ruled that there were material omissions related to the search warrant affidavit of probable cause that misled the magistrate in determining whether probable cause existed to search the residence, and that those omissions precluded a finding that the good faith exception applied in this case. Initially, the Court in its opinion appears to conflate the search warrant affidavit of probable cause— which was for the purpose of searching the residence for drugs and related evidence after some items were observed by police in plain view during the protective sweep—with the earlier protective sweep during which police looked for Gilliam's children. The material omissions cited by the Court that were not included in the affidavit of probable cause— omissions related to conversations about Gilliam's children—were not relevant to a determination of whether there was probable cause that

drugs and drug-related evidence would be found at the residence. The affiants needed only to state that they entered the residence based on exigent circumstances and observed in plain view the items that they noted in the affidavit. Yet the Court found that the affiants misled the magistrate by not including conversations about Gilliam's children. And the Court held that due to those material omissions, the good faith exception did not apply in this case.

The Court explained that the good faith exception does not apply, "… particularly … when the Affidavit is reviewed to assess whether the Magistrate Judge was misled by information contained in the Affidavit or omitted from it." Doc. 103 at 55. In one instance, the Court cited as a material omission a fact that was actually included in the affidavit of probable cause. At the suppression hearing, Officer Palka testified that he was bluffing during the conversation when he advised the Defendant that he had followed him to his residence and knew his North Main Street address. *Doc. 103 at 55.* The Court points to the recitation of this conversation in the affidavit and concludes that it misled the district justice to believe that Officer Palka actually knew the precise residence on North Main Street where the defendant was staying

because the reference to "bluffing" was omitted from the affidavit. *Id.* The Court concludes that such an omission was "disingenuous" of Officer Palka for his failure to advise the Magistrate Judge that he was bluffing and did not know at that time in the investigation the Defendant's actual North Main Street address. *Id.* But this overlooks the fact that in the paragraph of the affidavit immediately following the conversation characterized by the Court as "disingenuous" and as "omitting" important facts, Officer Palka expressly told the district justice that at that point in the investigation "*officers still did not know an actual address on North Main Street for Mr. Gilliam . . .*" Gov. Exhibit 1 at 8.

The Memorandum Opinion cites other "facts" that the Court faults Officers Palka and Ference for omitting from the affidavit to include: (1) that the investigation had contact information for Connie Overstreet; (2) that the affidavit failed to include a timeline; and (3) that the affidavit failed to include the fact that they were informed upon entering 374 North Main Street that there were no children in the house. Doc. 103 at 57. None of these "omitted" facts, however, undermine the finding or probable cause. Nor would inclusion of this

information have undermined the probable cause to issue the warrant. Indeed, as noted above, the Court seems to conflate the purpose of the search warrant in its discussion regarding these "omitted" facts with the protective sweep and search for the children that occurred prior to the search warrant. The search warrant application and affidavit serve the purpose of advising the independent district justice of the facts sufficient to demonstrate that there is probable cause to believe that there is evidence of a crime located at the particular place subject to search. *Ill. V. Gates*, 462 U.S. 213, 238 (1983) (Probable cause to search means "a fair probability that contraband or evidence of a crime will be found in a particular place."). In this case, the only facts necessary for that purpose had to do with whether or not there was probable cause to believe there would be evidence of illegal drug distribution located at Gilliam's residence. Every "omitted" fact cited by the Court has to do with the Court's concern of whether or not exigent circumstances existed at the time of law enforcement's initial entry of the residence the previous day. Or more precisely, the "omitted" facts may suggest whether or not law enforcement were sufficiently vigorous in its investigation to determine where the Defendant's children were located.

Such facts, however, were irrelevant for purposes of obtaining the search warrant – though they may become relevant at a later time to determine if evidence that was found during the execution of the search warrant was "fruit of the poisonous tree" as a result of the circumstances of the initial entry by police the previous day.

Furthermore, none of the "omitted" facts if added to the affidavit of probable cause would have undermined the probable cause to search the residence for evidence of illegal drug activity.

Taking each of these omitted facts in turn:

(1) The affidavit did not include the fact that the investigation had contact information for Connie Overstreet. However, the affidavit did inform the district justice that the Defendant wished to contact Overstreet by telephone in order to check on the status of his children. Gov. Exhibit 1. What is more, had the affidavit contained the more complete information (not just that the investigation had Overstreet's contact information) of Officer Ferences's telephone call consistent with his incident report and hearing testimony, the district justice would have been informed that investigators had a telephone conversation

with Overstreet and that she was not willing to provide information as to the whereabouts of the Defendant's children. Such evidence has no bearing on probable cause to believe contraband may be located at the place to be searched. If anything, inclusion of the "omitted" facts strengthens the "exigent circumstances" to justify the initial protective sweep – something that is of concern to this Court but not relevant to the reviewing district justice.

*(2)* The affiants did not include a timeline in the affidavit which would have shown that the "welfare check" occurred long after they allegedly learned that Defendant's children were in the house on North Main Street. This assertion is factually inaccurate and unsupported by the record. In the first instance, the affidavit consists of six pages of single space text which outlines the investigation in narrative giving the district justice sufficient information as to the extent of the investigation and how it developed. What is more, there is no long gap between discovery of the Defendant's actual address on North Main Street and the welfare check of the children and

others present in the house.  As is clear from the affidavit, even prior to the buy-bust of the Defendant, investigators were attempting to locate his address by driving in the area and looking for vehicles associated with him.  Gov. Exhibit 1.  After the defendant's arrest he and his vehicle were transported to Kingston PD, and officers were dispatched in an attempt to find his children by looking for other vehicles associated with the defendant and finding his residence.  Hr'g Tr. at 75, 131.  Officer Ference and another officer conducted knock and talks at the residences near North Main and Elm streets to see if anyone knew where the Defendant lived or if there were any children alone in an apartment.  *Id.*  Officers were not initially successful in finding the residence or the children.  *Id.* at 132.  Back at the Kingston PD, Officer Palka spoke to the Defendant, who did not provide his address, but indicated that his children were home alone.  *Id.*  After this interaction in the narrative of the affidavit, the district justice was informed that Sgt. Brown from the Edwardsville Police Department was at the Kingston PD on other business and noticed the Defendant in lockup.  *Id.*

Sgt. Brown informed Officer Palka that the Defendant was stopped in a particular Toyota vehicle earlier in the day. *Id.* "Officers still did not know an actual address on North Main Street for Mr. Gilliam" so that this information was conveyed to numerous State, Local and Federal authorities that were assisting the investigation. *Id.* Officers began to search the area of North Main Street for this vehicle. *Id.* "Officer Miller ... spotted the Toyota" and so advised Officer Ference, who in turn noticed that only one house in the area had its lights on, which was adjacent to the vehicle located at 374 North Main Street. *Id.* Even at this point, officers were not certain that 374 North Main Street was correct, and approached and knocked on the door of the house. *Id.* No one answered. *Id.* Officers then used one of the keys confiscated from the Defendant at the time of his arrest to see if it would fit in the lock and turn the door. *Id.*; Hr'g Tr. 136 – 137. Until the key turned the lock officers still had not identified the Defendant's residence, where they believed his children would be found in the presence of carfentanil. *Id.* According to Officer Ference's testimony,

which is consistent with the information in the affidavit, once the door was open officers announced themselves yet again and saw an individual move inside the home. *Id.* They immediately conducted a welfare check to see if there were any children present. Thus, it is clear that a timeline would *not* have alerted the district justice that there was a "long delay" from the discovery of the Defendant's home address and the welfare check on the Defendant's children. The police only discovered Gilliam's residence when they turned the key in the lock—and then they immediately began to look for the children.

The only purpose a time-line would have served in the affidavit would have been to demonstrate to the district justice that the information in the affidavit to support the search was not stale. This, of course, was not an issue where police saw drug evidence in plain view and the residence was secured pending a search warrant which was granted within 24 hours.

(3) The affiants did not include the fact that they were informed upon entering 374 North Main Street that there were no children in the house. While it is true that the affidavit did

not include the fact that officers asked individuals present at the time of the welfare check whether there were children present, the affidavit informed the district justice that "[o]ne of Gilliam's keys fit the front door lock and opened the door. Officers entered the house and conducted a sweep to look for the children. Officers encountered several people inside *but no children*. Gov. Exhibit 1 (emphasis added). The Government fails to understand how the "omitted" fact is meant to mislead the district justice when the affidavit states that no children were present at the time of the welfare check. As for the officers conduct in continuing the welfare search after having been advised by some unknown resident that children are not present, had the officers simply taken this person's word and stopped their search they would have been seriously negligent in their duty to protect any child potentially present in the house – as well as adults who may have been exposed to carfentanil. But as noted above, the circumstances surrounding the protective sweep and initial search for children were not relevant to an affidavit of probable cause that sought

authorization to search for drugs and related evidence after the initial search for the children had already occurred.

In finding that Officers Palka and Ference were less then credible in their testimony the Court does not rely on any testimony or evidence that contradicts any prior statement made by either officer. Rather, the Court formulates hypotheticals concerning how the Court would have conducted the investigation, points out that the officers failed to follow its preferred methods, and then equates such failure to proof that officers were less than credible. An example of this can be seen in the Court's formulation and reliance on the interaction of investigating officers with Connie Overstreet. Both Officer Palka's and Officer Ference's testimony is consistent with prior police reports and with each other's testimony concerning Connie Overstreet. Officer Palka received information from the Defendant regarding Overstreet's telephone number and conveyed that information to Officer Ference – the officer who was in Wilkes-Barre and attempting to locate the Defendant's children. Hr'g Tr. 78; 132 – 133. In the Court's view and findings, the fact that Palka did not more fully explore with the

Defendant Overstreet's connection with the children prior to conveying Overstreet's contact information to his colleague undermines Officer Palka's otherwise consistent testimony. Doc. 103 at 38. Similarly, the Court faults Officer Ference for failing to ask its preferred questions during his telephone conversation with Overstreet, and as a result assumes the officers' testimony is at best "curious." Doc. 103 at 39. It is no doubt true that the investigation may have benefited from more probing questioning by these officers. However, questions or actions that occur to the Court long after the fact and from the benefit of hindsight should not be used to make a determination about the credibility of these officers or their sincere belief that children may have been in danger at the residence. Officers were faced with a fast moving, dynamic investigation, and perhaps did not think of every question to ask or consider every investigative step—that occurred to the Court with the benefit of hindsight—to take in seeking to safeguard Gilliam's children and any other person who might come into contact with this deadly narcotic. Questioning these officer's credibility because they were not as effective as they could have been or did not take steps that the Court in hindsight thought they should, is both unfair and more

importantly, has nothing to do with whether the testimony "reflects an ability to accurately recollect matters at hand, the extent to which the testimony is corroborated or contradicted by other evidence, and whether the testimony withstands a common sense test of reason and logic." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005).[2]

The one instance of "inconsistent" testimony cited by the Court to cast doubt on police credibility is that given by Officer Palka concerning the plan to locate the Defendant's children.

> "Palka's testimony about when a plan was formulated to find the children is somewhat conflicting. On direct examination, he stated that, before he talked to Defendant, officers began to formulate a plan and dispatched Officers Miller and Ference to try to find the house on North Main Street (because they had a "very strong indication he was living on North Main Street") where they assumed the children were when they were not with Defendant at the buy-bust. On cross-examination, Palka was asked the following question: "The first time-in the search warrant and in the incident report – that first time there's any mention of a plan to find the children is after the conversation with Mr. Gilliam

---

[2] The Government intends to file a Motion *In Limine* addressing the Court's credibility determinations. The motion will request, among other relief, that this Honorable Court rule that its credibility findings related to Officers Palka and Ference in the Memorandum of Opinion are not *Giglio* materials subject to disclosure, and that the Court's credibility determinations be inadmissible for purposes of impeachment. *See e.g. United States v. Jeanpierre*, 636 F.3d 416 (8th Cir. 2011).

> supposedly takes place at Kingston PD: correct?  Palka
> responded "[c]orrect, that's when we knew we did not have
> the kids."

*Id.* Citation omitted.  However, as noted above, both Officer Palka and

Officer Ference testified consistently with each other that Officer

Ference was dispatched to Wilkes-Barre to search for the Defendant's

children after driving the Defendant's vehicle to Kingston PD.  Hr'g Tr.

at 74 - 75; 131.  More to the point, in citing to Officer Palka's testimony

about the apparent conflict in testimony regarding the beginning of the

plan to look for the Defendant's children, the Court overlooked Officer

Palka's follow up answer on cross-examination.  *Id.* at 108 – 109.

During this exchange, Defendant's counsel again asks Officer Palka

whether this plan to find the children was first mentioned in the

incident report or the search warrant.  *Id.* at 108.  At that point Officer

Palka explained that "[w]e don't have everything in the report that

could never – like, never happen or do happen – we have to come upon

the scenario first.  If we had the children in the car, there would be no

reason to have a plan to go get the children, they wouldn't be in danger,

we would have them.  So now we knew the kids weren't in the car or

weren't with Mr. Gilliam, now we had to try to find where these kids

were, especially, since Mr. Gilliam in the cell told me there was two kids in the house." *Id.* The longer exchange gives a better and clearer explanation that this was an ongoing investigation, and police were reacting to information as it was happening in real time. As pointed out by Officer Palka, no report is going to capture every aspect of such a fast-moving investigation, and it is unfair to attribute to police a lack of credibility based on this record and under the circumstances of these events. The record supports that the police officers acted in good faith.

Based on the above, the Government requests the Court to reconsider its ruling that the police officers' belief that an exigency existed was not reasonable, and reverse its ruling that suppressed the evidence seized from the residence.

The Court determined in its opinion that the police officers' "primary" motivation in entering the residence without a warrant to conduct a protective sweep was to seize evidence of carfentanil with which to prosecute the defendant. But given the dangerous nature of carfentanil, a concern for the safety of anyone present in the residence and the need to know if carfentanil was present in the residence are not mutually exclusive since the danger to children and others was the very

presence of carfentanil in the residence. As the Court points out in its Memorandum Opinion, the police had evidence of the Defendant's criminal activity to support prosecution as the result of the buy-bust operation alone. Doc. 103 at 61. They did not need additional drug evidence to prosecute Gilliam, and by entering the residence in the manner they did they exposed themselves to potentially serious harm in their efforts to safeguard anyone, including children, who may have been in that residence with the carfentanil. Under these circumstances, the police's belief that exigent circumstances existed was reasonable. The police acted in good faith and the evidence should not be suppressed.

Conclusion

Accordingly, the Government respectfully requests the Court reconsider its ruling that the evidence seized from the defendant's residence should be suppressed.

Respectfully submitted,

DAVID J. FREED
United States Attorney

/s/ Todd K. Hinkley

Todd K. Hinkley
Assistant United States Attorney
PO Box 309
Scranton, PA 18501-0309
Tel: (570) 348-2800

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21st day of August 2020, I caused the foregoing

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION

was electronically filed, and served via ECF on Counsel for the Defendant, Elliot Smith, Esquire.

/s/ Todd K. Hinkley
Todd K. Hinkley
Assistant U.S. Attorney